UNITED STATES of America, Appellee,

v.

Rico McLAUGHLIN, Appellant.

No. 97–3011.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 4, 1998.

Decided Dec. 18, 1998.

Beverly G. Dyer, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was A.J. Kramer, Federal Public Defender.

Elizabeth C. Coombe, Assistant United States Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, United States Attorney, John R. Fisher, Mary Patrice Brown and Henry K. Kopel, Assistant United States Attorneys.

Before: WALD, SENTELLE and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge SENTELLE.

Dissenting opinion filed by Circuit Judge TATEL.

SENTELLE, Circuit Judge:

Rico McLaughlin was convicted of multiple federal and D.C. offenses, all related to the shooting of a government informant. After trial, McLaughlin filed a motion for a new trial on the ground that he was denied the right to confer with counsel during a brief recess between his cross-examination and redirect. That motion was denied. On appeal, McLaughlin argues that the court's denial of his request to confer with counsel during the recess between his cross-examination and redirect violated the Sixth Amendment. He also argues that he was convicted and sentenced under multiple federal and D.C. provisions which Congress did not intend to apply to the same underlying conduct, and that his simultaneous convictions under these statutes violate the Double Jeopardy Clause. We find that there was no Sixth Amendment violation, and we reject appellant's arguments that his federal and D.C. convictions cannot stand simultaneously. However, we do find that defendant's convictions under two D.C. assault provisions merge. Accordingly, we reverse his conviction for aggravated assault and vacate the concurrent sentence imposed for that offense.

## I. Background

Rico McLaughlin was tried in the United States District Court for the District of Columbia in connection with the shooting of Thomas White. White had been an informant in an operation called Project Uptown which involved a joint task force of the Bureau of Alcohol, Tobacco and Firearms, the U.S. Secret Service, the Department of Housing and Urban Development, and the Metropolitan Police Department. On April 26, 1995, White received multiple gunshot wounds while being chased down a neighborhood street in the District of Columbia. At trial, White testified that McLaughlin was a drug dealer with whom he had transacted in the past, and identified McLaughlin as the shooter. An eyewitness who saw the shooting from a distance confirmed some aspects of the identification. The court also heard evidence from neighborhood residents, who testified that there was a rumor in the neighborhood that White was an informant, and

that McLaughlin might have known about that rumor.

Mr. McLaughlin took the stand in his own defense. After the government finished its cross-examination, the court ordered a brief recess, noting that defense counsel could redirect after the recess, if desired. In response to a request from the government, and over defense objections, the court directed counsel not to speak to defendant during the break "about anything he said in his testimony today." The recess lasted fifteen minutes. After the recess, defense counsel stated that "given the Court's ruling," she had no redirect. Defense counsel stated: "I should also stress for the record that I did think to myself what other areas I might want to explore with Mr. McLaughlin. I have identified other areas, and I would be prepared to consult with him on that. But given the Court's ruling, I am not permitted to do that, so I have no further questions."

At the close of trial, McLaughlin was convicted of (1) knowingly causing bodily injury with the intent to retaliate for providing information to law enforcement, 18 U.S.C. § 1513(b); (2) using or carrying a firearm in relation to a crime of violence, 18 U.S.C. § 924(c); (3) assault with intent to kill while armed, D.C.Code §§ 22–501 and 22–3202; (4) aggravated assault while armed, D.C.Code §§ 22–504.1 and 22–3202; (5) possession of a firearm during a crime of violence, D.C.Code § 22–3204(b); and (6) carrying a pistol without a license, D.C.Code § 22–3204(a).

On December 2, 1996, defendant filed a written motion for new trial on the ground that the court's order denying him the right to confer with counsel about his testimony during the recess violated his Sixth Amendment rights. The court denied defendant's motion, and later issued a written memorandum explaining the denial. *United States v. McLaughlin*, 955 F.Supp. 132 (D.D.C.1997). Defendant was sentenced on all six counts on which he was convicted. He received eighty-seven months imprisonment on count one, including an upward departure of twenty-four months; sixty months imprisonment on count two, counts one and two to be served consecutively; five to fifteen years imprisonment on count three; five to fifteen years

imprisonment on count four, counts three and four to be served concurrently but consecutively to counts one and two; five to fifteen years imprisonment on count five; and forty months to ten years imprisonment on count six, counts five and six to be served concurrently, but consecutively to counts one through four. ·

The defendant now appeals, contending that the court's denial of his request to confer with counsel during the recess denied him his Sixth Amendment right to counsel. He also argues that the district court erred in allowing him to be convicted and sentenced under multiple provisions which Congress did not intend to give rise to simultaneous convictions, and whose simultaneous application offends the Double Jeopardy Clause. In addition, appellant asserts that the prosecutor made improper statements at trial which substantially prejudiced the outcome and that the district court made an improper upward departure from the sentencing guidelines on the § 1513(b) charge. While we have carefully considered each of appellant's arguments, the prosecutorial misconduct and sentencing departure arguments do not merit separate discussion.

## II. The Right to Confer with Counsel

■ We first examine appellant's argument that the district court's refusal to allow him to confer with defense counsel during a brief recess between defendant's cross-examination and redirect denied him his Sixth Amendment right to counsel. Asserting this alleged denial, McLaughlin requested a new trial pursuant to Fed.R.Crim.P. 33. He now appeals from the district court's denial of his request.

Three cases frame the Sixth Amendment issue in this case: *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Mudd v. United States*, 798 F.2d 1509 (D.C.Cir.1986); and *Perry v. Leeke*, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989). *Geders* held that prohibiting discussions with defense counsel during an overnight recess shortly before defendant's cross-examination violated the Sixth Amendment, apparently without a showing of prejudice to the defendant. 425 U.S. at 91, 96 S.Ct. 1330.

*Mudd* held that the Sixth Amendment was violated by an order for a defendant not to speak to his defense attorney over a weekend recess between his direct and cross-examination, even where the order prohibited only discussions regarding the defendant's testimony. 798 F.2d at 1512. *Mudd* squarely held that no showing of prejudice is required once a Sixth Amendment violation is established, but noted that restricting discussion during a very brief recess might give rise to no Sixth Amendment violation at all. *Id.*· at 1514. Both *Geders* and *Mudd,* while holding that prohibiting consultation with counsel during the relatively lengthy recesses in those cases was a Sixth Amendment violation, explicitly declined to decide whether the same would necessarily be true if a shorter recess were involved. *Geders*, 425 U.S. at 89 n. 2, 96 S.Ct. 1330; *Mudd*, 798 F.2d at 1514 (suggesting that orders which do not impose blanket prohibitions on discussions between counsel and defendant but prevent only discussion regarding a defendant's testimony "only interfere with the right to counsel when they cover a substantial trial recess").

The question left open by *Geders* and *Mudd* was settled by *Perry v. Leeke*, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), which held that, while no prejudice need be shown once a Sixth Amendment violation is established, the Sixth Amendment is not violated where no discussions are allowed between a defendant and his attorney during a fifteen-minute recess between the defendant's direct and cross. The *Perry* Court distinguished *Geders*, noting that during an overnight recess, a defendant may need access to his attorney to discuss matters that "go beyond the content of the defendant's own testimony." *Id.* at 284, 109 S.Ct. 594. While noting that "[i]t is the defendant's right to unrestricted access to his lawyer for advice on a variety of trial-related matters that is controlling in the context of a long recess," *id.*, the Court held that "in a short recess in which it is appropriate to presume that nothing but the testimony will be discussed, the testifying defendant does not have a constitutional right to advice." *Id.*

The lengths of the recesses in this case and in *Perry* are similar. The order at issue in *Perry* barred all communication, while the order in this case was less restrictive, barring only communication regarding defendant's testimony. Nonetheless, appellant argues that this case is distinguishable from *Perry* because the recess here was after cross-examination rather than before. We agree with the district court that this distinction is not constitutionally significant. *See McLaughlin*, 955 F.Supp. at 135.

Appellant notes that the *Perry* Court emphasized the importance of maintaining the integrity of cross-examination, a concern not applicable here since the cross had been completed. Portions of *Perry* did express concern about preserving the quality of cross-examination. *See Perry*, 488 U.S. at 282, 109 S.Ct. 594 ("[C]ross-examination is more likely to elicit truthful responses if it goes forward without allowing the witness an opportunity to consult with third parties, including his or her lawyer."); *id.* at 283, 109 S.Ct. 594 (" 'Once the defendant places himself at the very heart of the trial process, it only comports with basic fairness that the story presented on direct is measured for its accuracy and completeness by uninfluenced testimony on cross-examination.' ") (quoting *United States v. DiLapi*, 651 F.2d 140, 151 (2d Cir. 1981) (Mishler, J., concurring)). However, other portions of the *Perry* opinion make clear that the decision did not turn on the fact that the recess was before cross-examination rather than after. Indeed, the Court phrased its holding in general terms: "We merely hold that the Federal Constitution does not compel every trial judge to allow the defendant to consult with his lawyer *while his testimony is in progress* if the judge decides that there is a good reason to interrupt the trial for a few minutes." *Perry*, 488 U.S. at 284–85, 109 S.Ct. 594 (emphasis added).

Concededly, the *Perry* Court was faced with a recess before cross-examination, so that its conclusions may be considered *dicta* regarding recesses at other times during a defendant's testimony. But even if the *Perry* holding is not directly controlling, a decision that there was a Sixth Amendment violation in the present case would be inconsistent with *Perry*'s rationale. The *Perry* Court observed that "when a defendant becomes a witness, he has no constitutional right to consult with his lawyer while he is testifying." *Id.* at 281, 109 S.Ct. 594.[1] The Court observed that courts commonly instruct witnesses not to discuss their testimony during trial, and reasoned that while the Confrontation Clause immunizes a defendant from physical sequestration, it does not immunize him from limited nondiscussion orders. As the Court noted, "when [a defendant] assumes the role of a witness, the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to him as well." *Id.* at 282, 109 S.Ct. 594.

Appellant argues that the need to confer with counsel after cross-examination is unique in that it is at that time that a decision is made regarding whether to redirect at all, and that such a decision is best made after discussion with the defendant. However, appellant does not, and could not, argue that a defendant is always entitled to a brief recess before redirect to confer with counsel. As the Supreme Court stated in *Perry*, "a trial judge has the unquestioned power to refuse to declare a recess at the close of direct testimony—or at any other point in the examination of a witness...." *Id.* at 283, 109 S.Ct. 594. Accordingly, appellant argues only that if there happens to be such a recess, the defendant must be allowed to confer with counsel about his testimony. We cannot hold that Sixth Amendment rights turn on such happenstance. It cannot be the law that the right to counsel attaches on the fortuity of a recess before defendant's redirect when there is no right to such a recess.

Our dissenting colleague asserts that in his view, "this case has nothing to do with a defendant's right to a recess." Dissent at 17.

---

1. Our dissenting colleague, while recognizing the quoted language from the Supreme Court, states that "nothing in *Perry* suggests that the Court intended the word 'testifying' to apply to redirect examination." Dissent at 19. The dissent suggests no definition of "testifying" that would not include redirect examination.

He then proceeds to set forth an analysis under which the Sixth Amendment affords the defendant a right to consultation with counsel at the end of cross-examination and before announcing a decision as to whether or not to conduct redirect examination. Indeed, in our colleague's view, "[d]efense counsel cannot responsibly assess the [ ] risks and benefits" of conducting redirect "without first consulting the client about what occurred during cross." Dissent at 18. If such a right to consult exists, then this presupposes a right to have some sort of recess, whether or not our colleague wishes to announce this necessary conclusion. Appellant did not argue that such a right to consult exists even where there is no recess, and indeed, conceded the contrary at oral argument. Given the Supreme Court's recognition of the trial judge's "unquestioned power" to refuse a recess in *Perry*, we hold that the appellant is correct, and our colleague mistaken. No such right to a recess exists.

Furthermore, we do not see the unique need to confer with counsel before redirect that appellant asserts. While there may be important matters which could be discussed prior to redirect, there may also be important matters which counsel might discuss with a defendant prior to cross-examination, or for that matter during direct or cross. As the *Mudd* panel noted, a defense attorney may want to advise the defendant before cross-examination on demeanor or speaking style, or to warn the defendant before cross-examination about questions that could raise self-incrimination concerns or questions that could lead the defendant to mention excluded evidence. 798 F.2d at 1512. *Perry* does not rest on the premise that there are no legitimate reasons for a defendant to confer with counsel before cross-examination, and arguing that there are legitimate reasons to confer with counsel before redirect cannot distinguish this situation from *Perry*. The question before us is not whether there are legitimate reasons for a defendant to confer with counsel before redirect, but whether there is a Sixth Amendment right to do so. Under the reasoning of *Perry*, there is no such right.

Our colleague sees this case as controlled by *Geders* rather than *Perry* on the theory that the decision of whether to conduct redirect is a "tactical decision." He cites from *Geders* the language that the overnight recess in that case involved "tactical decisions to be made and strategies to be reviewed." Thus, he reasons, since there was a tactical decision to be made here, *Geders*, not *Perry*, must control. Our colleague's conclusion does not follow from the *Geders* language. The quoted language from *Geders*, as our colleague recognizes, reflects the Court's recognition that overnight "recesses are often times of intensive work, with tactical decisions to be made and strategies to be reviewed." True, a tactical decision may be genuinely at issue at the time of the submission to redirect. Indeed, many such decisions may be circulating in the courtroom air. Many may be there between direct and cross also. Nonetheless, the Supreme Court in *Perry* made it plain that the need to make decisions does not change the fact that a defendant witness "has no constitutional right to consult with his lawyer while he is testifying." *Perry* at 281, 109 S.Ct. 594. As our colleague recognizes, the *Perry* Court stated the proposition that " 'cross-examination is more likely to elicit truthful responses if it goes forward without allowing the witness an opportunity to consult with third parties, including his or her lawyer.' " Dissent at 4 (quoting *Perry* at 282), 109 S.Ct. 594. As our colleague further recognizes, the undertaking of redirect establishes the right of the prosecution to re-cross. No less than the original cross, re-cross-examination is more likely to elicit truthful response without third-party consultation. The fifteen or twenty minute recess is not like an overnight recess, a time of intensive work with tactical decisions to be made and strategies to be reviewed. Rather, it is like the recess between direct and cross considered in *Perry*: a time too short for broad-ranging strategic discussions but a prime time for the discussion of the witness' testimony. Just as the recess in *Perry* could have resulted in the sort of coached answers on cross that the Supreme Court feared but for the trial court's restriction, an open-ended attorney-client session at the end of cross could allow

for a reconstruction of the defendant's testimony on redirect subjected only to a freshly coached re-cross-examination.

Our colleague's assertion that "[w]hen tactical questions arise, the Sixth Amendment requires defendants to be allowed to consult with their attorneys," cannot as a practical matter state an acceptable proposition of Sixth Amendment law. Dissent at 19. Tactical questions can arise at any point during the defendant's testimony, and it is plain from *Perry* as well as trial experience that a defendant has no unrestricted right to interrupt the testimony for consultation. No more has he a right to consultation during a fortuitous recess.[2]

## III. Defendant's Multiple Convictions and Sentences

■ In the District of Columbia, the government may "simultaneously charg[e] in one indictment offenses under similar federal and D.C. statutes arising from a single transaction." *United States v. Jones,* 527 F.2d 817, 829 n. 15 (D.C.Cir.1975). Federal district courts in the District of Columbia have jurisdiction over offenses "under any law applicable exclusively to the District of Columbia which offense is joined in the same information or indictment with any Federal offense." D.C.Code § 11–502(3). Where an indictment contains both District of Columbia and federal charges, the district court may adjudicate the entire case. *United States v. Wade,* 152 F.3d 969, 970 (D.C.Cir.1998). In this instance, the government charged defendant with six counts, including two federal counts and four District of Columbia counts. A grand jury returned an indictment on each of the six counts: (1) knowingly causing bodily injury with the intent to retaliate for providing information to law enforcement, 18 U.S.C. § 1513(b); (2) using or carrying a firearm in relation to a crime of violence, 18 U.S.C. § 924(c); (3) assault with intent to kill while armed, D.C.Code §§ 22–501 and 22–3202; (4) aggravated assault while armed, D.C.Code §§ 22–504.1 and 22–3202; (5) possession of a firearm during a crime of violence, D.C.Code § 22–3204(b); and (6) carrying a pistol without a license, D.C.Code § 22–3204(a). Appellant does not challenge the inclusion of these counts in the same indictment, but argues that his conviction and sentencing on all six counts is not in keeping with congressional intent regarding the application of these provisions and is barred by the Double Jeopardy Clause.

The parties agree that because appellant has first raised this argument on appeal, we review for plain error. *Cf. United States v. Foster,* 988 F.2d 206, 209 (D.C.Cir.1993). This standard is set forth by Fed.R.Crim.P. 52(b), which provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Under this standard, the Court of Appeals should correct a plain error affecting substantial rights if the error " 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *United States v. Olano,* 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936)).

### A. Legislative Intent, Double Jeopardy, and the *Blockburger* Test

Appellant argues that several of his convictions were under statutory provisions which should not be applied to the same conduct, either because Congress did not so intend or because the Double Jeopardy Clause does not so permit. In particular, appellant argues that his conviction under 18 U.S.C. § 1513(b) cannot stand together with his convictions for assault with intent to kill while armed, D.C.Code §§ 22–501 and 22–3202, and for aggravated assault while armed, D.C.Code §§ 22–504.1 and 22–3202; that the two "carrying" provisions, 18 U.S.C. § 924(c) and D.C.Code § 22–3204(b), cannot both apply; and that his convictions under the two D.C. assault provisions merge.

■ Whether conduct can give rise to multiple convictions in a single trial is essentially a question of statutory construction, but it is statutory construction with constitu-

---

**2.** We find it significant that the ABA standards on criminal defense do not list whether to redirect as one of the essential areas where the client makes the choice. *Criminal Justice Prosecution Function and Defense Function Standards,* 4–5.2, Control and Direction of the Case.

tional implications. This is so because the question of Congress's intent and the question of what the Double Jeopardy Clause permits in such situations are closely intertwined. The Double Jeopardy Clause affords three basic protections: "It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (footnotes omitted). It is the third strand of protection that is at issue in this case. The Double Jeopardy Clause's protection against cumulative punishments is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature. *Ohio v. Johnson*, 467 U.S. 493, 499, 104 S.Ct. 2536, 81 L.Ed.2d 425 (1984). Thus in determining whether convictions under multiple provisions violate the Double Jeopardy Clause, our inquiry is directed at legislative intent. *United States v. Hoyle*, 122 F.3d 48, 49 (D.C.Cir.1997). When a defendant is charged under multiple provisions, the "Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). Thus the Double Jeopardy Clause serves principally as a restraint on courts and prosecutors, not the legislature. *Brown v. Ohio*, 432 U.S. 161, 165, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977). Accordingly, analysis of prosecutions under multiple statutes under the Double Jeopardy Clause is limited to considering whether the legislature intended to allow simultaneous convictions. *United States v. Sumler*, 136 F.3d 188, 189 (D.C.Cir. 1998). If the legislature intends to impose multiple punishment, imposition of such sentences does not violate Double Jeopardy. *Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981).

■ The test set forth in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), is often used to determine whether the legislature intended to allow punishment under multiple provisions. *United States v. Dixon*, 509 U.S. 688, 696, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993). Under this test, we compare the elements of the offenses to see whether "each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304, 52 S.Ct. 180. The application of the test focuses on the statutory elements of the offense, not on the proof offered in a given case. *Iannelli v. United States*, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975). Hence if each provision requires proof of an element that the other does not, the *Blockburger* test is satisfied, indicating that simultaneous application of the two provisions was intended. Conversely, if the provisions do not each require an element that the other does not, the *Blockburger* test is not satisfied, indicating that simultaneous application of the two provisions was not intended.

■ The *Blockburger* test functions both as a rule of statutory construction and a constitutional presumption. As a tool of statutory construction, the *Blockburger* test is not absolutely controlling. *See, e.g., Albernaz*, 450 U.S. at 340, 101 S.Ct. 1137. In particular, failing the *Blockburger* test does not necessarily imply that two provisions may not be applied together, as the ultimate question is one of legislative intent. If the legislature intends two criminal provisions to apply simultaneously, applying them together does not offend the Double Jeopardy Clause, even if the two provisions would otherwise be considered as defining the same offense under the *Blockburger* test. It is here, however, that *Blockburger* functions as a constitutional presumption for the protection of defendants—under the Double Jeopardy Clause, two provisions may apply to the same conduct despite failing the *Blockburger* test, but only if there are other clear indications that the provisions were intended to be applied together. As the Court noted in *Whalen v. United States*, 445 U.S. 684, 691–92, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), "[t]he assumption underlying the rule is that Congress ordinarily does not intend to punish the same offense under two different statutes."

Several cases illustrate that where there is clear evidence of legislative intent, multiple

sentences are possible even though a *Blockburger* analysis would indicate otherwise. In *Missouri v. Hunter*, 459 U.S. 359, 368, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983), the Court considered whether a defendant was properly sentenced for both robbery and armed criminal action under Missouri law. Although the two sentences were improper under a *Blockburger* analysis, the Court held that the sentences were permissible. The Court concluded that where the Missouri legislature had made it clear that it intended cumulative punishment for the violation of two statutes it was the intent of the legislature, not the *Blockburger* test, which controlled. In *Garrett v. United States*, 471 U.S. 773, 779, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), the Court again refused to treat the *Blockburger* rule as a conclusive determinant of legislative intent. The Court there concluded that Congress clearly intended to allow conviction for both a continuing criminal enterprise and the predicate offense, although application of the *Blockburger* test indicated the two were the same offense. In *United States v. White*, 116 F.3d 903, 931–32 (D.C.Cir.1997), this court held that convictions for a RICO conspiracy and a drug conspiracy in the same proceeding did not violate the Double Jeopardy Clause. Although the two conspiracies were the same under *Blockburger*, we concluded that Congress intended to authorize cumulative punishments. *Id.* at 932. *See also Iannelli*, 420 U.S. at 779, 95 S.Ct. 1284 (finding that Congress intended to allow punishment for both conspiracy and underlying offense given longstanding historical distinction).

■ Just as failing *Blockburger* does not preclude punishment under multiple provisions, passing *Blockburger* does not mandate it. In this context, the *Blockburger* test functions as a rule of statutory construction. We recognized this in *United States v. Canty*, 469 F.2d 114, 127 (D.C.Cir.1972), when we noted that "even [where] two provisions require different elements of proof, there must still be a determination that Congress intended the provisions to bear separate punishments when applied to a single act or transaction." At one level, this simply states the unremarkable fact that regardless of the outcome of the *Blockburger* test, a court may not impose punishment without ultimately

concluding that the legislature so intended. The contrary proposition would allow courts to exceed their authority and undermine the separation of powers. *See Whalen*, 445 U.S. at 689, 100 S.Ct. 1432. But noting that a court must limit punishments to those Congress intended does not answer the question underlying our statement in *Canty*—How are we to determine Congress's intent? Our statement in *Canty* makes clear that the *Blockburger* test is not always the whole of our analysis. Indeed, it could not be, for two provisions could "pass" the *Blockburger* test but contain plain indications in their text that they were not intended to be applied together.

Nonetheless, the value of having a predictable and consistent rule for determining which provisions may apply together is great. Thus even where it functions only as a rule of statutory construction, the *Blockburger* test cannot be disregarded. The question of what manifestations of congressional intent make resort to *Blockburger* unnecessary or trump the outcome of the *Blockburger* test is a recurrent one, and is encountered again today.

**B. Appellant's Convictions under 18 U.S.C. § 1513(b) and the D.C. Assault Provisions**

■ 18 U.S.C. § 1513 criminalizes retaliation against witnesses, victims, and informants. Subsection (a) provides penalties for "[w]hoever kills or attempts to kill another person with intent to retaliate" for serving as a witness or providing information to law enforcement. In the case of an attempt, the punishment provided is imprisonment for not more than twenty years. Subsection (b), the provision charged here, provides that "[w]hoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for [serving as a witness or providing information to law enforcement,] or attempts to do so," shall be fined, or imprisoned not more than ten years.

Under D.C.Code § 22–501, assault with intent to kill carries a sentence of two to fifteen years. Under § 22–504.1, aggravated assault carries a maximum ten-year sentence. A person commits aggravated assault if he "knowingly or purposely causes serious bodily injury to another person," or if he causes serious bodily injury by intentionally or knowingly creating a grave risk under "circumstances manifesting extreme indifference to human life." Both assault with intent to kill and aggravated assault are subject to enhanced penalties if committed while armed. D.C.Code § 22–3202.

Examining the elements of § 1513(b) and each of the D.C. assault provisions at issue reveals that under the *Blockburger* test, § 1513(b) is distinct from both assault with intent to kill while armed and aggravated assault while armed. Section 1513(b) requires proof of intent to retaliate, which is not required under either D.C. assault provision. Assault with intent to kill while armed under D.C.Code §§ 22–501 and 22–3202 requires proof of intent to kill and proof that the offender was armed, neither of which are required by § 1513(b). Aggravated assault while armed under D.C.Code § 22–504.1 requires "serious bodily injury," while § 1513(b) requires only "bodily injury" or damage to "tangible property." Aggravated assault while armed also requires that the offender was armed, which is not required by § 1513(b). Thus under the *Blockburger* test, § 1513(b) is distinct from both the D.C. assault provisions at issue.

However, appellant argues that *Blockburger* is not dispositive in this instance. He cites a line of cases holding that certain federal and D.C. statutes were not intended to be applied to the same conduct, notwithstanding that the provisions did not define the same offense under the *Blockburger* test. None of these cases addresses the precise issue in this case. Two of the cases cited involved the federal bank robbery statute. In *United States v. Canty*, 469 F.2d 114 (D.C.Cir.1972), we held that a defendant's convictions for both assault with a dangerous weapon under D.C.Code § 22–502 and for taking money or property from a federal bank by force, violence, or intimidation could

not stand. We noted that "[t]he federal bank robbery statute establishes a comprehensive scheme for prosecuting and punishing persons who rob federally-insured banks." *Id.* at 127. Instead of prosecuting entirely within the bank robbery scheme, the federal government charged the defendant with the lowest tier of robbery in the federal scheme, and sought to punish the aggravated portion of the offense via the D.C. assault provision. By venturing outside the comprehensive scheme created by Congress for dealing with such offenses, the government had obtained a greater sentence than would otherwise have been possible. *Id.* at 128. We encountered similar facts in *United States v. Leek*, 665 F.2d 383 (D.C.Cir.1981), where the defendant was convicted of entering a bank with intent to commit robbery under the Federal Bank Robbery Act, as well as assault with a dangerous weapon under the D.C.Code. As in *Canty*, the government had declined to prosecute on the highest possible federal charge, instead charging a lower tier under the Federal Bank Robbery Act in combination with a D.C. assault charge. As in *Canty*, we noted that "the Federal Bank Robbery Act is carefully designed, matching maximum penalties with specific offenses," and held that "fragmentation of a single course of conduct to enable use of a local statute to multiply convictions and enhance punishment is impermissible." *Id.* at 388.

Appellant argues that the present case is analogous to these cases regarding the Federal Bank Robbery Act. In particular, he argues that the government could have charged § 1513(a), but instead charged the less serious offense, § 1513(b), paired with the D.C. assault provisions, in order to obtain a longer sentence. An attempt to kill in retaliation under § 1513(a) would have been limited to a sentence of twenty years. Appellant received a sentence of seven years and three months under § 1513(b), and a sentence of five to fifteen years under each of the D.C. assault provisions, with the sentences under the two D.C. assault provisions to be served concurrently. Hence his time served under these provisions could potentially be over twenty-two years as opposed to the twenty-year maximum provided by § 1513(a). (Of course, if less time were actu-

ally served on the D.C. assault charges, his time served under § 1513(b) and the D.C. assault provisions could be much less than the federal maximum under § 1513(a).) Thus this scenario is in many respects similar to that decried in *Canty* and *Leek*. For example, Canty could have been prosecuted under the federal scheme for assault with a dangerous weapon in connection with a bank robbery, carrying a maximum of twenty-five years. He was instead charged under a less serious federal provision, bank robbery by force and violence, (twenty-year maximum), paired with assault with a dangerous weapon under the D.C.Code (ten-year maximum). *Canty*, 469 F.2d at 127.

We nonetheless conclude that *Canty* and *Leek* are distinguishable from the case at hand. *Canty* was premised on the existence of a comprehensive federal scheme which by its nature made resort to local charges improper. *United States v. Jones*, 527 F.2d 817, 828 n. 12 (D.C.Cir.1975). As we noted in *Canty*, the federal bank robbery statute "subdivides the offense into a series of steps—a continuum running from entry with intent to rob, to robbery by force and violence, to robbery with the aid of a dangerous weapon, to robbery resulting in death or kidnapping." 469 F.2d at 127. Section 1513, in contrast, is less comprehensive. Its provisions are not narrowly tailored to reflect differences in behavior. In particular, subsection (b) applies equally to retaliatory conduct causing bodily injury (however serious), damage to tangible property, or mere threats to engage in such conduct. Given this less comprehensive structure, there is no reason to conclude that Congress intended § 1513 to be the exclusive mechanism available for conduct falling within its purview. Therefore, the U.S. Attorney was free to charge D.C. provisions as well, and free to charge the defendant with the offenses which could yield the highest sentence. *See Jones*, 527 F.2d at 820–21. *Cf. United States v. Batchelder*, 442 U.S. 114, 125, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979) ("Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution, neither is he entitled to choose the penalty scheme under which he will be sentenced.").

Appellant also cites two cases interpreting the federal mail robbery statute, but again, we find the present case distinguishable. In *United States v. Spears*, 449 F.2d 946 (D.C.Cir.1971), we concluded that Congress did not intend to allow the same conduct to give rise to convictions for robbery under the District of Columbia statutes and for assault with intent to rob under the federal mail robbery statute. We noted that the federal provision proscribed only assaults which formed "an integral part of an unsuccessful attempt to rob a mail carrier." *Id.* at 954. In light of "conventional doctrines" barring conviction for both an attempt and the completed offense, *id.*, we concluded that Congress did not intend the federal provision to apply where there was a conviction under the D.C.Code for completed robbery. In contrast, no "conventional doctrines" counsel against allowing a traditional assault conviction in combination with a conviction under a special prohibition on retaliatory conduct. *Cf. United States v. Alston*, 609 F.2d 531 (D.C.Cir.1979) (holding that both federal mail and wire fraud statutes and the D.C. false pretenses statute could apply to the same conduct, given that the special interest protected under the federal statutes was clearly distinct from the general property interest safeguarded by the local statute).

In *United States v. Knight*, 509 F.2d 354 (D.C.Cir.1974), we considered whether convictions for armed robbery under both the District of Columbia Code and simple robbery under the federal mail robbery statute were permissible. We concluded that Congress had "deliberately addressed itself to the distinction between simple mail robbery and the case where a dangerous weapon is involved, and ha[d] provided an increase of punishment only if the use of the dangerous weapon puts the life of the mail custodian in jeopardy." *Id.* at 362. Since the jury acquitted on the charge of putting the mail custodian in jeopardy and convicted instead of simple mail robbery, we held that it was impermissible for the government to nonetheless reach the weapon use by obtaining a conviction under the D.C. armed robbery provision. *Id.* Our decision in *Knight* rested on a belief that applying the District of

Columbia armed robbery statute to the armed mail robbery in that case would have flouted Congress's intent. From the fact that Congress had provided enhanced penalties for only a certain type of armed conduct, we inferred a congressional intent that other types of armed conduct should not be subject to enhanced penalties. In contrast, appellant points to no congressional distinctions in the retaliation statute which would be flouted by resort to the D.C.Code in this case.

In conclusion, we find no reason that the *Blockburger* test should not be determinative in this instance. We do not claim to find a clear indication in the statutes that Congress intended them to apply together. Neither 18 U.S.C. § 1513 nor the D.C. assault provisions mention the other or give any other positive indication of whether or not the federal and D.C. provisions are intended to apply simultaneously. However, where a federal and District offense satisfy *Blockburger,* no such positive indication of intent to apply together is required. *See U.S. v. Sumler,* 136 F.3d 188, 190–92 (D.C.Cir.1998) (upholding convictions for both first degree murder while armed under District of Columbia law and killing in furtherance of a continuing criminal enterprise under federal law where *Blockburger* test satisfied and no contrary intent demonstrated). *Cf. Albernaz,* 450 U.S. at 341, 101 S.Ct. 1137. Instead, it is only necessary that whatever manifestations of congressional intent are present do not seriously call into doubt whether the *Blockburger* result accurately captures legislative intent. Where, as here, the text and structure of the provisions at issue shed little light on whether Congress would intend them to apply together, there is no reason to deviate from the *Blockburger* test. The original version of § 1513 was passed in 1982. *See* Pub.L. No. 97–291, § 4(a), 96 Stat. 1250 (1982). We must presume that when Congress drafted this provision it knew that behavior subject to this provision would sometimes fall within the assault provisions of the District of Columbia. We must also presume that Congress was aware of the *Blockburger* rule, and legislated with it in mind. *Albernaz,* 450 U.S. at 342, 101 S.Ct. 1137. Given this, the absence of other significant indications of intent regarding whether the federal provi-

sion is exclusive leads us to conclude that the *Blockburger* analysis controls.

## C. Appellant's Convictions under 18 U.S.C. § 924(c) and D.C.Code § 22–3204(b)

■ Defendant was sentenced for violating both 18 U.S.C. § 924(c), using or carrying a firearm during or in relation to a drug trafficking offense or crime of violence, and D.C.Code § 22–3204(b), possession of a firearm during the commission of a crime of violence. Section 924(c) requires proof that the defendant (1) "use[d] or carrie[d]" (2) "a firearm" (3) "during and in relation to" (4) "any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States." 18 U.S.C. § 924(c)(1). A "crime of violence" is defined as a federal offense that "is a felony and (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3).

D.C.Code § 22–3204(b) requires proof that the defendant (1) "possess" (2) within the District of Columbia (3) a "firearm or imitation firearm" (4) "while committing a crime of violence or dangerous crime as defined in § 22–3201." Section 22–3201 defines a crime of violence as one of twenty-three specified offenses, all of which include actual, threatened, or intended violence, or the likelihood of violence, directed against a person. D.C.Code § 22–3201(f). Both assault with intent to kill and aggravated assault are among the offenses specified. Dangerous crime is defined as "distribution of or possession with intent to distribute a controlled substance, if the offense is punishable by imprisonment for more than 1 year." D.C.Code § 22–3201(g).

Both the federal and D.C. statutes are silent regarding whether they are intended to be applied simultaneously. Nor is there any structural indication whether or not Congress intended both provisions to apply to

the same conduct. We therefore rely on the *Blockburger* test. The government has argued that these two provisions each require proof of an element that the other does not. The government notes that conviction under § 924(c) requires proof that the defendant used or carried a firearm, while conviction under§ 22–3204(b) requires proof only of possession. *Cf. United States v. Smart*, 98 F.3d 1379, 1393 (D.C.Cir.1996) (more than possession required to trigger § 924(c)(1)), *with Brown v. United States*, 691 A.2d 1167, 1169 (D.C.1997) (mere possession of proscribed weapon is sufficient to trigger § 22–3204(b)). Conversely, conviction under § 22–3204(b) requires proof that the possession occurred during one of a specified list of D.C. offenses. Conviction under § 924(c) can be based on use of a firearm during offenses other than those to which § 22–3204(b) applies. Thus the government claims that § 22–3204(b) requires proof of an element that § 924(c) does not—that the underlying offense is one of the offenses specified in § 22–3204–and the two offenses are not the same under the *Blockburger* test.

While we agree that the *Blockburger* test is satisfied here, the government's analysis oversimplifies the application of *Blockburger* to these facts. The proper method of applying the *Blockburger* test in this situation is suggested by the Supreme Court's opinion in *Whalen v. United States*, 445 U.S. 684, 694, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). *Whalen* considered whether convictions for both rape and felony murder based on rape were proper. Conducting a traditional *Blockburger* analysis, the government in *Whalen* argued that the rape offense requires rape, while felony murder could be based on five felonies other than rape. Conversely, the government there argued that felony murder requires a killing, which rape does not. However, the *Whalen* Court did not accept the government's *Blockburger* analysis. The Court reasoned that if instead of listing the six felonies which can serve as a basis for felony murder in the alternative, Congress had separately proscribed the six types of felony murder (*i.e.*, rape-felony murder, robbery-felony murder, etc.), rape would clearly be a lesser included offense of the rape version of felony murder. The Court refused to

ascribe significance to this difference in drafting, and found that the dual convictions were improper. *See also White*, 116 F.3d at 931 (recognizing that *Whalen* analysis is required where a statute lists several alternative sub-offenses).

Like the felony murder offense considered in *Whalen*, both 18 U.S.C. § 924(c) and D.C.Code § 22–3204 are compound offenses, satisfied by possession during any one of a list of underlying offenses. After *Whalen*, the fact that the lists of offenses which can serve as the predicate offense for the two provisions are not coextensive does not end the *Blockburger* analysis. Instead, we treat this as if there is a separate provision for each offense on the list. In this case, the district court's instructions to the jury clearly linked the § 924 charge to the federal retaliation count, and the § 22–3204(b) charge to the D.C. assault counts. Thus we are in effect considering whether the defendant was appropriately convicted of "possession under D.C.Code § 22–3204(b) during the commission of assault under D.C.Code §§ 22–504.1 and 22–501" and "possession under 18 U.S.C. § 924(c) during the commission of retaliation under 18 U.S.C. § 1513(b)." Taking this view, the first conviction requires commission of the D.C. assault offense, and the second requires commission of the retaliation offense. Since we have already concluded that the assault charges and the retaliation charge are not the "same offense," defendant's § 22–3204(b) conviction and his § 924(c) conviction each required an element that the other did not. Therefore, the *Blockburger* test is satisfied.

### D. Appellant's Convictions under D.C.Code § 22–501 and § 22–504.1

 Finally, we consider whether defendant was properly convicted for both assault with intent to kill while armed under D.C.Code §§ 22–501 and 22–3202 and aggravated assault while armed under D.C.Code §§ 22–504.1 and 22–3202.

The District of Columbia Code contains a series of assault offenses. Section 22–501 prohibits assault with intent to kill, to rob, to poison, or to commit sexual abuse, with a

maximum sentence of fifteen years. Section 22–502 prohibits assault with intent to commit mayhem or assault with a dangerous weapon, with a maximum sentence of ten years. Section 22–503 prohibits assault with intent to commit any other offense, with a maximum sentence of five years. Section 22–504 prohibits simple assault, threats, and stalking. The maximum sentence for simple assault is 180 days.

In 1994, an aggravated assault provision was added to the existing assault provisions of the D.C.Code. *See* Omnibus Criminal Justice Reform Amendment Act of 1994, D.C. Law No. 10–151, § 202. At the same time, the penalty for simple assault was decreased from twelve months to 180 days. *Id.; Burgess v. United States,* 681 A.2d 1090, 1094 (D.C.1996). The new aggravated assault provision applies to conduct which knowingly, purposely, or recklessly causes serious bodily injury to another person, and carries a maximum sentence of ten years. D.C.Code § 22–504.1.

The government correctly points out that assault with intent to kill requires intent to kill, which aggravated assault does not, and that aggravated assault requires serious bodily injury, which assault with intent to kill does not. Hence, the government notes, the *Blockburger* test is satisfied. However, we do not believe that *Blockburger* is determinative in this instance.

As we noted earlier in this opinion, the ultimate question is one of legislative intent, and *Blockburger* is not always controlling. Just as we may conclude that a legislature intended to allow punishment under multiple provisions when a *Blockburger* analysis taken alone would not support such a conclusion, *see Hunter,* 459 U.S. at 368, 103 S.Ct. 673; *Garrett,* 471 U.S. at 779, 105 S.Ct. 2407 we may conclude that a legislature intended not to allow punishment under multiple provisions although a *Blockburger* analysis would allow it. In the latter instance, as in the former, it is the intent of the legislature that controls. In *Prince v. United States,* 352 U.S. 322, 77 S.Ct. 403, 1 L.Ed.2d 370 (1957), without undertaking a *Blockburger* analysis, the Court held that Congress did not intend unlawful entry of a bank and bank robbery to

be consecutively punishable under different provisions of the Federal Bank Robbery Act. In *Heflin v. United States,* 358 U.S. 415, 79 S.Ct. 451, 3 L.Ed.2d 407 (1959), again without employing a *Blockburger* analysis, the Court interpreted the same act not to provide for punishment for both taking property from a bank and receiving the same stolen property. *See also Milanovich v. United States,* 365 U.S. 551, 81 S.Ct. 728, 5 L.Ed.2d 773 (1961) (interpreting federal statute regarding theft from government agencies as not permitting punishment both for taking and for receiving stolen property from a United States naval base); *Jeffers v. United States,* 432 U.S. 137, 155–56, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977) (concluding that Congress did not intend cumulative penalties under 18 U.S.C. §§ 846 and 848 without undertaking a *Blockburger* analysis); *United States v. Dale,* 991 F.2d 819, 858 (D.C.Cir.1993) (holding that I.R.S. Code offenses of subscribing to a false tax return and aiding preparation of a false tax return should merge even though they would not be considered the same offense under *Blockburger).*

It is not coincidental that each of the cited cases involved prosecution under two provisions of a single statutory scheme. Offenses defined by the same statutory scheme can be viewed as somewhere between the usual *Blockburger* situation involving two entirely distinct provisions and cases involving multiple convictions under a single statutory provision. Cases in the latter category are often referred to as "unit of prosecution" cases, as they consider whether the conduct at issue was intended to give rise to more than one offense under the same provision. *See, e.g., Bell v. United States,* 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905 (1955) (simultaneous transportation of more than one woman constitutes a single violation of Mann Act); *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 73 S.Ct. 227, 97 L.Ed. 260 (1952) (under the Fair Labor Standards Act, unit of prosecution is a course of conduct, not each individual act). In "unit of prosecution" cases, although the ultimate question remains one of legislative intent, the *Blockburger* test is not used. *Sanabria v. United States,* 437 U.S. 54, 70 n. 24, 98 S.Ct. 2170, 57

L.Ed.2d 43 (1978); *United States v. Evans,* 854 F.2d 56, 58 (5th Cir.1988); *Morris v. United States,* 622 A.2d 1116, 1130 (D.C. 1993). Instead, courts will presume that a single violation is intended unless Congress clearly expresses its intention to allow multiple offenses under the statute. *See Bell,* 349 U.S. at 84, 75 S.Ct. 620 ("[I]f Congress does not fix the punishment for a federal offense clearly and without ambiguity, doubt will be resolved against turning a single transaction into multiple offenses...."). "Unit of prosecution" cases are thus resolved in favor of lenity. *Id.*

Cases like this one, which involve offenses within the same statutory scheme but not the same provision, are not properly "unit of prosecution" cases. Unlike in those cases, the *Blockburger* rule is applicable. Indeed, *Blockburger* itself involved provisions within a single statutory scheme. *See Blockburger,* 284 U.S. at 305, 52 S.Ct. 180 (allowing convictions under multiple provisions of the Harrison Narcotic Act). However, because offenses defined by the same statutory scheme will often have similar purposes and serve similar interests, it may be less appropriate to assume from silence that the legislature intended to allow multiple punishments as long as *Blockburger* is satisfied. *See United States v. Nichols,* 401 F.Supp. 1377 (E.D.Mich.1975) (concluding that the "*Bell–Prince–Heflin–Milanovich*" line establishes a principle of lenity in construing *closely related* statutory provisions arguably violated by a single act") (emphasis added). *Cf. United States v. Alston,* 609 F.2d 531, 536 (D.C.Cir.1979) (noting disparate interests served by federal and D.C. statute in allowing application of both); *Irby v. United States,* 390 F.2d 432, 433–34 (D.C.Cir.1967) (noting that housebreaking and robbery involved distinct interests in allowing both to operate).

In cases involving application of more than one provision of a single statutory scheme, the absence of positive indications that the provisions were intended to apply simultaneously becomes more troublesome. In such situations, the structure of the scheme itself may provide an indication that the scheme was intended as a hierarchy of offenses, with only one of the offenses applying to conduct in a given instance. *See United States v. Makres,* 598 F.2d 1072, 1075 (7th Cir.1979) (noting that when two provisions are in the same section of the code, the structure of the statute and the apparent relationship of the provisions may support the conclusion that cumulative punishment was not intended, but that the structure and relationship of the provisions are less likely to be helpful when two separate sections of the code are involved). Thus resort to *Blockburger* in such cases may be unnecessary (as in *Prince, Heflin, Milanovich,* and *Jeffers*) or nondeterminative (as in *Dale*).

Although there is by no means any special rule for handling *Blockburger* situations involving provisions within a single statutory scheme, courts in such situations are often more hesitant to base punishment under both provisions on *Blockburger* alone than is the case with provisions from distinct statutory schemes. *See, e.g., United States v. Munoz-Romo,* 989 F.2d 757, 759 (5th Cir.1993) (holding that although 18 U.S.C. § 922(g)(1) and § 922(g)(5) constitute distinct offenses under *Blockburger,* "Congress, by rooting all the offenses in a single legislative enactment and including all the offenses in subsections of the same statute, signalled that it did not intend multiple punishments for the possession of a single weapon"); *United States v. Parr,* 741 F.2d 878 (6th Cir.1984) (concluding that fact that two provisions of the Mann Act were not the same under *Blockburger* was not controlling, and proceeding to consider other indications of whether provisions were intended to apply together). *See also Dale,* 991 F.2d at 859 n. 61 (noting that the analysis by which it concluded that two Internal Revenue Code offenses could not apply simultaneously "does not spill over to embrace prosecutions for Internal Revenue Code offenses plus offenses under other statutes with discrete objectives").

*Gore v. United States,* 357 U.S. 386, 390–91, 78 S.Ct. 1280, 2 L.Ed.2d 1405 (1958), which might be cited to the contrary, is in fact distinguishable. The Court in that case did reject the argument that three sections which were codified together and which shared the single purpose of outlawing non-

medicinal sales of narcotics were not intended to apply together. However, in doing so it noted factors other than the *Blockburger* analysis which supported its conclusion: the three provisions were enacted at three different times, and Congress had manifested an attitude of severity toward the narcotics laws.

In the present case, despite the outcome of a *Blockburger* analysis, we are skeptical as to whether Congress intended a single assault to lead to convictions for both assault with intent to kill while armed and aggravated assault. We faced a similar question regarding two D.C. assault provisions in *Ingram v. United States*, 353 F.2d 872 (D.C.Cir.1965). There, appellant was convicted of both assault with intent to kill, in violation of D.C.Code § 22–501, and assault with a dangerous weapon, in violation of D.C.Code § 22–502. Although the dissent pointed out that the offenses were distinct under the *Blockburger* test, we held that consecutive sentences could not be imposed for the two offenses. We noted that the hierarchical structure of the D.C. assault provisions suggested that the two assault offenses at issue were "offenses on the same spectrum, the former being worse than the latter." *Id.* at 875. We concluded that "[a]lthough the various sections may define 'separate and distinct offenses,' it is unlikely that Congress intended a single act to be punished cumulatively as both a more *and* a less serious form of aggravated assault." *Id.* But see *Bridgeford v. United States*, 411 A.2d 633 (D.C. 1980) (holding that assault with intent to kill under § 22–501 and mayhem under § 22–506 do not merge given the differences in elements and in the interests protected); *Robinson v. United States*, 501 A.2d 1273 (D.C. 1985) (concluding that convictions for both assault with intent to commit rape and assault with intent to commit sodomy were proper in light of distinct elements and interests served, but also noting that the first assault on the victim had concluded before the second began).

Courts interpreting the assault provisions of other jurisdictions have been similarly reluctant to assume that a single act of assault was intended to be punished under multiple assault provisions. *See State v. Jenkins*, 307 Md. 501, 515 A.2d 465, 474–75 (Md.1986) (citing *Ingram* in holding that although the two offenses pass *Blockburger*, Maryland's assault with intent to murder and assault with intent to maim provisions were not intended to apply to a single assault, as "an assault aggravated up to the felonious level in two separate ways [does not] become two assaults") (quoting *Manigault v. State*, 61 Md.App. 271, 486 A.2d 240 (Md. Ct. Spec. App.1985)); *State v. Denton*, 938 S.W.2d 373, 382 (Tenn.1996) (concluding that although each required proof of fact that other did not, convictions under both Tennessee's aggravated assault and attempted manslaughter provisions were inappropriate, given common purpose of both to deter assaultive-type conduct); *State v. Ritter*, 714 A.2d 624, 626 (Vt.1998) (holding that two aggravated domestic assault provisions which pass *Blockburger* test were nonetheless intended merely to define alternative ways of committing aggravated assault, not to create two separate offenses).

While we recognized in *Ingram* the hierarchical structure of the D.C. assault provisions, we did not reverse either the assault with intent to kill or assault with a deadly weapon convictions. Instead, we simply held that consecutive sentences were improper and remanded for resentencing on one of the counts. *Ingram*, 353 F.2d at 873. However, in light of subsequent case law, the relief afforded in *Ingram* is no longer sufficient. Since *Ingram*, the Supreme Court has made clear that the propriety of multiple convictions must be carefully considered even where the sentences are concurrent. *See Ball v. United States*, 470 U.S. 856, 865, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985); *Benton v. Maryland*, 395 U.S. 784, 790, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). This is so because a conviction, even one with a concurrent sentence, carries significant collateral consequences. *See Ball*, 470 U.S. at 864–65, 105 S.Ct. 1668. After *Ball*, "punishment" in this context includes not only the sentence, but the conviction itself. *See id.* at 861, 105 S.Ct. 1668. Hence, the reasoning which supported vacating one of the sentences at issue in *Ingram* now also supports reversing one of

the assault convictions here.[3] Accordingly, we reverse appellant's conviction for aggravated assault.

## IV. Conclusion

In light of the foregoing, we affirm appellant's convictions under 18 U.S.C. § 1513(b), 18 U.S.C. § 924(c), D.C.Code § 22–501, D.C.Code § 22–3204(b), and D.C.Code § 22–3204(a). However, we vacate the judgment of conviction under D.C.Code § 22–504.1.

TATEL, Circuit Judge, dissenting:

During a recess at the end of McLaughlin's cross-examination, the district court ordered him not to discuss with his lawyer anything "relating to his testimony and potential redirect examination." *United States v. McLaughlin*, 955 F.Supp. 132, 133 n. 1 (D.D.C.1997). Objecting both before and after the break, McLaughlin's lawyer informed the court that she wished to consult with her client because she had "identified other areas" that she "might want to explore" with him on redirect. This court, reasoning that McLaughlin had no constitutional right to the recess in the first place, now holds that he had no right to consult with his lawyer because Sixth Amendment rights cannot turn on "happenstance." Maj. Op. at 5. But this case has nothing to do with a defendant's right to a recess. The question before us is whether the Sixth Amendment right to counsel required the court to allow McLaughlin's lawyer to consult with him regarding the important tactical decision of whether to conduct redirect. Because I believe it did, I respectfully dissent.

It is a bedrock principle of our system of justice that "to minimize the imbalance in the adversary system," *United States v. Ash*, 413 U.S. 300, 309, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973), a criminal defendant has the fundamental right to "the guiding hand of counsel at every step in the proceedings against him." *Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 77 L.Ed. 158 (1932). Indeed, " '[o]f all the rights that an accused person has, the right to be represented by counsel is by far

the most pervasive for it affects his ability to assert any other rights he may have.' " *United States v. Cronic*, 466 U.S. 648, 654, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (quoting Walter V. Schaefer, *Federalism and State Criminal Procedure*, 70 HARV. L. REV. 1, 8 (1956)).

In *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), the Supreme Court recognized that the Sixth Amendment guarantees not just the right to have counsel, but also the right to consult with counsel about important tactical decisions. More than merely allowing the defendant to participate in tactical decisions, consultation enables the lawyer to obtain factual information crucial to making them. *Geders* reversed the conviction of a defendant ordered by the trial court not to discuss his testimony with anyone, including his lawyer, during an overnight recess between his direct and cross-examinations. Acknowledging that trial courts ordinarily enjoy wide discretion to sequester witnesses in order to insulate them from "improper attempts to influence the[ir] testimony," *id.* at 87, 96 S.Ct. 1330, the Court nonetheless found that an overnight sequestration order unconstitutionally limits the right to counsel. "Such recesses," the Court said, "are often times of intensive work, with tactical decisions to be made and strategies to be reviewed." *Id.* at 88, 96 S.Ct. 1330. Observing that "[t]he lawyer may need to obtain from his client information" and "pursue inquiry along lines not fully explored earlier," *id.*, the Court held that the conflict between a trial court's otherwise proper sequestration order and a defendant's right to consult with counsel about tactical decisions must be resolved in favor of the Sixth Amendment. *See id.* at 91, 96 S.Ct. 1330.

The tactical decision involved in this case—whether to conduct redirect examination—undoubtedly required the assistance of counsel, including the opportunity for defense counsel to consult with the defendant in order to obtain information. While redirect examination allows a defendant to clarify tes-

---

3. We do not decide what application D.C.Code § 23–112 might have in this instance, as neither party has raised the issue.

timony, it also presents serious risks, for it subjects the defendant to further cross-examination. Given the uncertainty surrounding recross, prudent defense counsel must always consider whether the expected benefit of redirect outweighs its potential cost. *See* MARK A. DOMBROFF, DOMBROFF ON DIRECT AND CROSS-EXAMINATION § 11.2 (1985) ("The major question which you confront in conducting a redirect examination is the extent to which that redirect should be pursued."); FRANCIS X. BUSCH, LAW AND TACTICS IN JURY TRIALS § 353 (1949) ("[I]t is highly important for an advocate ... to pause and consider carefully whether the status of the witness' testimony, and the witness, after cross-examination, will be improved by a redirect examination."). Defense counsel cannot responsibly assess these risks and benefits without first consulting the client about what occurred during cross.

Imagine a cross-examination that elicits ambiguous testimony not explored on direct examination that, left alone, would harm the defense by confusing the jury. It cannot be that instead of permitting defense counsel to consult with the defendant to ascertain the facts underlying the ambiguous testimony, the law requires counsel to rely on educated guesswork in deciding whether to explore the ambiguity on redirect. The district court's order forbidding McLaughlin's attorney from consulting with him prior to redirect did exactly that: It forced her to choose between proceeding with redirect on a hunch or foregoing the opportunity to clarify her client's testimony. After the recess, the attorney told the court:

> I should ... stress for the record that [during the break] I did think to myself what other areas I might want to explore with Mr. McLaughlin. I have identified other areas, and I would be prepared to consult with him on that. But given the Court's ruling, I am not permitted to do that, so I have no further questions.

The district court's order conflicts with *Geders*'s holding that the Sixth Amendment requires trial courts to allow defense counsel to obtain information from their clients prior to making important tactical decisions.

Nothing in *Perry v. Leeke*, 488 U.S. 272, 109 S.Ct. 594, 102 L.Ed.2d 624 (1989), displaces *Geders*. Unlike the overnight recess in *Geders*, in *Perry* there was "virtual certainty" that any conversation between the defendant and his lawyer during a fifteen minute recess between direct and cross would relate only to his ongoing testimony and would not "encompass matters ... that the defendant [has] a constitutional right to discuss with his lawyer, such as ... trial tactics." *Id.* at 283–84, 109 S.Ct. 594. Citing *Geders* with approval, *Perry* reaffirmed the principle that a trial court's interest in thwarting external influences on testimony, while legitimate, cannot defeat a criminal defendant's right to consult with counsel about tactical decisions. *See id.* at 284, 109 S.Ct. 594 (stating that the fact that discussions between a defendant and his attorney "will inevitably include some consideration of the defendant's ongoing testimony" does not compromise the basic right to "unrestricted access" to counsel regarding trial tactics). The difference between *Geders* and *Perry* turns not on the length of their respective recesses (as my colleagues suggest), but on the fact that during the pre-cross-examination recess in *Perry*, no legitimate tactical decisions had to be made, nor did the defendant have any need to provide information to his lawyer. The defendant's decision to testify left him with no choice but to submit to cross-examination and to answer the prosecutor's questions truthfully. Indeed, *Perry*'s analysis focused exclusively on the importance of maintaining the integrity of cross-examination and protecting the prosecution's ability to elicit uninfluenced testimony from the defendant. *See id.* at 282, 109 S.Ct. 594 ("[C]ross-examination is more likely to elicit truthful responses if it goes forward without allowing the witness an opportunity to consult with third parties, including his or her lawyer."); *id.* ("Cross-examination often depends for its effectiveness on the ability of counsel to punch holes in a witness' testimony at just the right time, in just the right way."); *id.* ("[C]ross-examination of a witness who is uncounseled between direct examination and cross-examination is more likely to lead to the discovery of truth than is cross-examination of a witness who is given

time to pause and consult with his attorney."). To be sure, *Mudd v. United States*, a pre-*Perry* decision, identified several subjects that defendants might want to discuss with counsel between direct and cross, such as demeanor, speaking style, and not mentioning excluded evidence. 798 F.2d 1509, 1512 (D.C.Cir.1986). But after *Perry*, no right to counsel attaches to such considerations because their discussion would interfere with the government's right to unencumbered cross-examination.

In contrast to *Perry*, this case presents no threat to the government's right to cross-examination uninfluenced by defense counsel because the prosecution had completed McLaughlin's cross. Also unlike in *Perry*, McLaughlin's lawyer faced a tactical decision—whether to conduct redirect—a decision she believed she could not make without consulting her client. It seems to me that this decision presented the defense with the same set of issues that it confronted when deciding whether McLaughlin should take the stand in the first place. McLaughlin was thus essentially in the same position between cross and redirect as he was before deciding whether to testify at all. Surely no one would argue that he had no Sixth Amendment right to consult with his lawyer regarding *that* tactical decision.

Although *Perry* also stated in broad language—language that my colleagues agree is dicta, *see* Maj. Op. at 5–6—that "a defendant ... has no constitutional right to consult with his lawyer *while he is testifying*," *id.* at 281, 109 S.Ct. 594 (emphasis added), nothing in *Perry* suggests that the Court intended the word "testifying" to apply to redirect examination. Not only did the Court never mention redirect examination, but *Perry*'s rationale cannot be extended to this case without running afoul of the very rule that it reaffirmed: When tactical questions arise, the Sixth Amendment requires defendants to be allowed to consult with their attorneys. My colleagues fault me for not offering a definition of the word "testifying" that excludes redirect, *see* Maj. Op. at 5 n.1, but they themselves make no effort to define the word to exclude the overnight recess between direct and cross in *Geders*. Indeed, because

the *Geders* recess came while the defendant was still "testifying," and because *Perry* unquestionably reaffirmed that the right to consult with counsel attached during the *Geders* recess, the *Perry* Court could not have intended the word "testifying" to be as broad as my colleagues read it.

A few final thoughts bear mentioning about my colleagues' effort to recharacterize McLaughlin's Sixth Amendment claim as a claim that he had a right to a recess. To begin with, affording defense counsel a reasonable opportunity to confer with the defendant prior to redirect would not necessarily require a recess; depending upon the circumstances, allowing the defendant and counsel to whisper to one another for a minute or two might suffice. But if a recess is required, the district court must order one not because the defendant has a right to a recess, but because the defendant has a constitutional right to counsel. This case no more involves a constitutional right to a recess than a prisoner's right to visits from his lawyer involves a constitutional right to visitation.

Second, McLaughlin's brief plainly argues that the right to counsel does not depend on the court declaring a recess. *See* Appellant's Br. at 34 ("[I]t was error ... for the court to deny defendant the right to confer with counsel during the 25–minute recess that took place, whether or not counsel would have had such a right had no recess been ordered."). True, counsel said the opposite at oral argument, but surely a defendant's constitutional right cannot turn on counsel's hasty answer to a judge's question, particularly where, as here, the brief is to the contrary.

Finally, the language from *Perry* that my colleagues quote out of context for the proposition that McLaughlin had no right to a recess before redirect has no applicability to this case because, once again, *Perry* focused solely on protecting the prosecution's right to a clean cross-examination. The full passage reads:

> "Once the defendant places himself at the very heart of the trial process, it only comports with basic fairness that the story presented on direct is measured for its

accuracy and completeness *by uninflu-enced testimony on cross-examination."*

*Thus,* just as a trial judge has the un-questioned power to refuse to declare a recess at the close of direct testimony—or at any other point in the examination of a witness—we think the judge must also have the power to maintain the status quo during a brief recess in which there is a virtual certainty that any conversation be-tween the witness and the lawyer would relate to that ongoing testimony.

*Perry,* 488 U.S. at 283–84, 109 S.Ct. 594 (citation and footnote omitted) (emphasis added). By using the word "thus," the Court clearly linked its reference to a recess to the previous sentence's discussion of the impor-tance of unencumbered cross-examinations, a discussion without relevance to the issue be-fore us.

The irony of this court's decision is not only that it impairs the Sixth Amendment right to counsel, but that by inhibiting redi-rect examination it also hampers the truth-seeking process, the central concern of both *Geders* and *Perry.* While cross-examination promotes the goal of truth-seeking, so does redirect. Redirect allows counsel to help the defendant clarify testimonial inconsistencies and ambiguities elicited through cross-exami-nation that might otherwise leave the factfin-der confused or distracted. The importance of redirect to the truth-seeking process can-not be overstated. "[O]ur adversarial system of justice ... is premised on the well-tested principle that truth ... is best discovered by powerful statements on both sides of the equation." *Penson v. Ohio,* 488 U.S. 75, 84, 109 S.Ct. 346, 102 L.Ed.2d 300 (1988) (inter-nal quotation omitted). While the possibility of improper coaching exists at *any* stage of *any* witness's testimony, *Geders* pointed out that lawyers operate under ethical standards that distinguish between "discussing testimo-ny and seeking improperly to influence it," and that cross—in this case recross—allows the prosecutor to expose any such influence. *Geders,* 425 U.S. at 89–90 & n. 3, 96 S.Ct. 1330. And as *Geders* squarely held, any remaining conflict between the risk of im-proper influence and an accused's fundamen-tal right to counsel must be resolved in favor

of the Sixth Amendment. *See id.* at 91, 96 S.Ct. 1330.

I would reverse McLaughlin's conviction on the ground that the district court's refusal to allow him to consult with his lawyer before redirect violated the Sixth Amendment. *See Perry,* 488 U.S. at 278–80, 109 S.Ct. 594 (holding that harmless error analysis does not apply to claims of "denial of access" to counsel). Accordingly, I would not reach the double jeopardy issues.