# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued December 7, 2009          Decided March 30, 2010

No. 03-3154

UNITED STATES OF AMERICA,
APPELLEE

v.

ABDUR R. MAHDI, ALSO KNOWN AS CHIEF,
ALSO KNOWN AS BIG CHIEF,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 01cr00396-01)

*Robert S. Becker*, appointed by the court, argued the cause
for the appellant.

*Stephanie Goldstein Brooker*, Assistant United States
Attorney, argued the cause for the appellee. *Roy W. McLeese III*
and *Mary B. McCord*, Assistant United States Attorneys, were
on brief.

Before: HENDERSON and GRIFFITH, *Circuit Judges*, and
WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: Abdur Mahdi was charged with operating a narcotics distribution enterprise in northwest Washington, D.C. and was convicted of 48 criminal counts involving possessing/distributing narcotics, racketeering, firearms use and possession, assault, murder, perjury and obstruction of justice. *See* 3d Re-typed Indictment, *United States v. Mahdi*, Crim. No. 01-396-1 (July 14, 2003) (Indictment). The district court sentenced Mahdi to ten life sentences (concurrent with each other and with lesser terms of incarceration) followed by one 7-year and five 25-year consecutive sentences. Judgment, *id*. (Dec. 22, 2003). Mahdi challenges both his convictions and his sentences on various grounds. We affirm his convictions and sentences with a single exception: we vacate his conviction on two counts of distribution of a controlled substance (cocaine base) and four counts of possessing with intent to distribute (PWID) a controlled substance (cocaine, cocaine base and marijuana), which together merge into six corresponding counts of distribution and PWID within 1,000 feet of a school, and remand for resentencing.

**I.**

Viewed in the light most favorable to the government, *see United States v. Lloyd*, 515 F.3d 1297, 1298-99 (D.C. Cir. 2008), the evidence establishes the following facts. Mahdi purchased narcotics from a man known as "Radar" and distributed them on the street either himself or through others. Initially, Mahdi purchased "crack" cocaine in bulk to resell in the street sales but later began to purchase cocaine powder and "cook" the crack himself, stretching the amounts with baking soda. In the course of his drug distribution operation, Mahdi conspired to commit or did commit more than twelve violent crimes.

The District of Columbia Metropolitan Police Department (MPD) investigated Mahdi over several years, using undercover

operatives, observation posts, video surveillance, wiretaps and search warrants. Particularly effective were undercover drug purchases conducted or overseen by MPD Officer Cynthia Lovely in March 2000, which formed the basis for various distribution counts and for warrants to search Mahdi's house and his automobiles (where he "stashed" drugs) which MPD executed in December 1999, August 2000, December 2000 and November 2001. The searches yielded, *inter alia*, over 600 grams of cocaine base as well as five firearms and corresponding ammunition.

Mahdi was arrested on November 15, 2001 after a grand jury returned a 324-count indictment against him and 15 others on November 8, 2001. After all of Mahdi's co-defendants entered guilty pleas, the indictment was filed in its final form ("[r]e-typed"), naming Mahdi alone as defendant and charging him with forty-nine counts involving drugs, firearms and acts of violence, including violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d),[1] the Violent Crimes in Aid of Racketeering statute (VICAR), 18 U.S.C. § 1959,[2] and 18 U.S.C. § 924(c).[3] *See* Indictment,

---

[1]This RICO provision makes it unlawful to conspire to participate in a pattern of racketeering activity as prohibited under section 1962(a), (b) or (c).

[2]VICAR, quoted in relevant part *infra* p. 8, sets out specific punishments for anyone who perpetrates specifically enumerated violent crimes in connection with racketeering activity.

[3]Section 924(c) prescribes minimum sentences for anyone convicted of carrying or using a firearm "during and in relation to any crime of violence or drug trafficking crime" or possessing a gun "in furtherance of any such crime."

Appellant's App. 201.[4]  Mahdi's trial began on April 14, 2003 and, on July 31, 2003, the jury returned a verdict convicting Mahdi of 48 counts.[5]  On December 4, 2003, the district court sentenced Mahdi to various concurrent prison terms, including ten life sentences followed by one 7- and five 25-year consecutive terms.  Mahdi filed a timely notice of appeal.

## II.

Mahdi contests his convictions and sentence on various grounds.  We address each ground seriatim.

### A.  *Multiplicitous Indictment*

When an indictment charges the same offense in more than one count, it often creates "a problem known as 'multiplicity,' " *United States v. Weathers*, 186 F.3d 948, 951 (D.C. Cir. 1999) (quoting 1A Charles Alan Wright, Federal Practice & Procedure

---

[4]The 49-count indictment charges the following offenses: 1 count of conspiracy to distribute and PWID cocaine, cocaine base and marijuana (Count 1); 1 count of RICO conspiracy (Count 2); 2 counts of carrying a pistol without a license (Counts 3, 18); 1 count of armed robbery (Count 4); 2 counts of assault with a dangerous weapon (Counts 5, 21); 10 counts of VICAR (Counts 6, 7, 9, 11, 13, 15, 17, 22, 24, 26); 1 count of first degree murder while armed (Count 12); 1 count of perjury (Count 19); 1 count of obstruction of justice (Count 20); 6 counts of assault with intent to murder while armed (Counts 8, 10, 14, 16, 23, 25); 6 counts of use of a firearm in a violent crime (Counts 27, 28, 29, 30, 31, 32); 5 counts of possessing a firearm during a crime of violence (Counts 33, 34, 35, 36, 37); 2 counts of distributing cocaine base (Counts 38, 39); 4 counts of PWID cocaine, cocaine base or marijuana (Counts 40, 41, 42, 43); and 6 counts of distribution or PWID of a controlled substance within 1,000 feet of a protected place (a school) (Counts 44, 45, 46, 47, 48, 49).

[5]The jury failed to reach a verdict on Count 4 (armed robbery) and the court declared a mistrial thereon.

§§ 142, 145, at 7-8 (3d ed.1999)), because "the Double Jeopardy Clause protects not only against 'a second prosecution for the same offense' after acquittal or conviction, but also against 'multiple punishments for the same offense,' " *id.* (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). "Whether defendant has in fact been punished twice for the same offense, however, depends upon what 'the legislature intended.' " *Id.* (quoting *Jones v. Thomas*, 491 U.S. 376, 381 (1989)). Mahdi argues that eight of the VICAR counts, three of the "sub-conspiracies" in the RICO count and five of the section 924(c) counts were also charged as violations of D.C. law, which means the latter are multiplicitous lesser included offenses of the VICAR, RICO and section 924(c) counts for which he may not be punished a second time. The government counters that Mahdi waived the multiplicity objection because he did not raise it until this appeal. *See Weathers*, 186 F.3d at 952 ("According to Circuit precedent, multiplicity claims of the kind presented here are defenses based on 'defects in the indictment' within the meaning of Rule 12(b)(2), and hence are waived under Rule 12(f) if not raised prior to trial."); *see* Fed. R. Crim. P. 12(b)(3) (formerly 12(b)(2)); *id*. R. 12(e) (formerly 12(f)). Mahdi asserts, in turn, he can show "good cause" for his failure to raise an objection below so as to excuse the waiver. *See id.* ("For good cause, the court may grant relief from the waiver."); *Weathers*, 186 F.3d at 952-53. We need not resolve the parties' waiver dispute. Because Mahdi did not object in the district court to the alleged multiplicity, we review his arguments for plain error. *See United States v. Kelly*, 552 F.3d 824, 829 (D.C. Cir. 2009) ("We apply plain error review to the double jeopardy issue because [the defendant] 'allow[ed][the] alleged error to pass without objection' below." (quoting *In re Sealed Case*, 283 F.3d 349, 352 (D.C. Cir. 2002))) (alteration in original); *see also* Appellant's Br. 8 (seeking plain error review). Under the plain error standard, " 'we will correct a district court's error only if (1) there is in fact an error to

correct; (2) the error is "plain"; (3) it "affects substantial rights"; and (4) it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." ' " *United States v. Walker*, 545 F.3d 1081, 1086-87 (D.C. Cir. 2008 (quoting *United States v. Taylor*, 497 F.3d 673, 676 (D.C. Cir. 2007) (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997))). Applying this standard, we conclude that the district court did not plainly err in failing to strike the alleged lesser included offenses from the indictment.

Mahdi contends the indictment is multiplicitous in three respects. His primary contention is that eight of the VICAR assault and murder counts (Counts 6, 9, 11, 13, 15, 17, 24, 26) are multiplicitous of the analogous D.C. criminal counts of assault with a dangerous weapon (Count 5), assault with intent to murder while armed (Counts 8, 10, 14, 16, 23, 25) and first degree murder while armed (Count 12). The court did not plainly err in failing *sua sponte* to strike the D.C. or federal counts as multiplicitous. To determine multiplicity vel non, courts generally apply the *Blockburger* test: " '[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not,' " i.e., whether either is a lesser included offense of the other. *Weathers*, 186 F.3d at 951 (quoting *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). The *Blockburger* test, however, provides only a canon of construction, not a "conclusive presumption of law." *Garrett v. United States*, 471 U.S. 773, 779 (1985); *see United States v. McLaughlin*, 164 F.3d 1, 8 (D.C. Cir. 1998) ("As a tool of statutory construction, the *Blockburger* test is not absolutely controlling." (citing *Albernaz v. United States*, 450 U.S. 333, 340 (1981))). " 'There is nothing in the Constitution which prevents Congress from punishing separately each step leading to the consummation of a transaction which it has power to prohibit and *punishing also the completed transaction*.' "

*Garrett*, 471 U.S. at 779 (quoting *Albrecht v. United States*, 273 U.S. 1, 11 (1927)) (emphasis in *Garrett*). Thus, "the *Blockburger* presumption must of course yield to a plainly expressed contrary view on the part of Congress," that is, "when the legislative intent is clear from the face of the statute or the legislative history." *Id.* (citing *Missouri v. Hunter*, 459 U.S. 359, 368 (1983); *Albernaz*, 450 U.S. at 340; *Whalen v. United States*, 445 U.S. 684, 691-92, (1980)); *McLaughlin*, 164 F.3d at 8-9 ("Several cases illustrate that where there is clear evidence of legislative intent, multiple sentences are possible even though a *Blockburger* analysis would indicate otherwise."); *United States v. White*, 116 F.3d 903, 932 (D.C. Cir. 1997) ("Even if one crime is a lesser included offense of another, punishments may be imposed for both 'if Congress intended that they be imposed.'" (quoting *United States v. Baker*, 63 F.3d 1478, 1494 (9th Cir. 1995), *cert. denied*, 516 U.S. 1097 (1996))). Accordingly, the Court in *Garrett* concluded that, "logic supports the conclusion, also indicated by the legislative history," that in enacting the "Continuing Criminal Enterprise" statute (CCE), the Congress "intended separate punishments for the underlying substantive predicates and for the CCE offense." *Garrett*, 471 U.S. at 795. We have similarly concluded that "RICO is intended to supplement, rather than replace, existing criminal provisions" and that therefore "although the drug conspiracy is a lesser included offense of the RICO conspiracy, cumulative punishments are authorized," noting that "the circuits that have held drug conspiracies to be lesser included offenses of RICO conspiracies or have not resolved the issue nevertheless allow cumulative sentences to stand on the ground that the Congress 'intended to permit, and perhaps sought to encourage, the imposition of cumulative sentences for RICO offenses and the underlying crimes.'" *White*, 116 F.3d at 932 (quoting *United States v. Kragness,* 830 F.2d 842, 864 (8th Cir. 1987)).

The VICAR statute's language supports the same sort of Congressional intent. It sets out specific punishments for anyone who "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual *in violation of the laws of any State or the United States*, or attempts or conspires so to do" in return for "anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a) (emphasis added). The quoted language at least suggests that the Congress intended to impose for a VICAR violation a cumulative penalty separate from and in addition to what is authorized by a particular "law[] of a[] State or the United States," as it did in enacting RICO and the CCE statute, based upon the showing of an additional statutory element —in the case of VICAR, that the underlying violent offense bears a certain relationship to racketeering activity. At least this is a reasonable construction, particularly in light of the close relationship between VICAR and RICO, the latter of which, as already noted, we have held to authorize separate sentences for both RICO and a lesser included offense. *See* 18 U.S.C. § 1959(b)(1) (VICAR " 'racketeering activity' has the meaning set forth in [RICO] section 1961"). Thus, " 'absent precedent from either the Supreme Court or this court' " that VICAR does not authorize cumulative punishments, the " 'asserted error . . . falls far short of plain error.' " *United States v. Perry*, 479 F.3d 885, 893 n.8 (D.C. Cir. 2007) (quoting *United States v. Vizcaino*, 202 F.3d 345, 348 (D.C. Cir. 2000)).

Second, Mahdi asserts that the RICO conspiracy count (Count 2) "subsumes . . . three subsidiary D.C. murder conspiracies" contained in it. Appellant's Br. 10. The D.C. murder conspiracies identified, however, were not charged as separate counts but merely as racketeering acts within the RICO count. Indictment 23-29. Thus, there is no multiplicity. *See*

*Weathers*, 186 F.3d at 951 (multiplicity occurs if "indictment charged the same offense *in more than one count*") (emphasis added).[6]

Finally, Mahdi contends that five of the counts charging use of a firearm during a drug trafficking crime or crime of violence (18 U.S.C. § 924(c)) (Counts 28-32) are multiplicitous with the D.C. counts charging possession of a firearm during a crime of violence (D.C. Code § 22-4504(b)) (PFCV) (Counts 33- 37). This argument fails under *Blockburger* because " 'each provision requires proof of a fact which the other does not,' " *Weathers*, 186 F.3d at 951 (quoting *Blockburger*, 284 U.S. at 304 )—that is, neither is a lesser included offense of the other. When analyzing compound offenses such as the two at issue here, we look to the predicate offenses charged, *McLaughlin*, 164 F.3d at 13—in this case VICAR (for section 924(c)) and first degree murder and assault with intent to murder (for section 22-4504(b)).    VICAR requires a showing of participation in a racketeering activity which the D.C. murder and assault charges do not; the D.C. charges, in turn, require proof of either premeditation or specific intent, *see United States v. Sumler*, 136 F.3d 188, 190 n.3 (D.C. Cir. 1998); *Hardy v. United States*, 2010 WL 374113, at *3 (D.C. Feb. 4, 2010), which VICAR does not.  Because a VICAR violation is not the "same offense" under the *Blockburger* test as either of the D.C. crimes, we conclude that the section 924(c) and the PFCV counts "each required an element that the other did not" and "[t]herefore, the Blockburger test is satisfied." *McLaughlin*, 164 F.3d at 13; *see also United States v. Diaz*, 176 F.3d 52, 101 (2d Cir. 1999) ("Murder under either [RICO or VICAR] . . . is not simply a federalized version of the state crime. Rather, it is

---

[6]In any event, as already noted, RICO authorizes cumulative sentences notwithstanding the charging of lesser included offenses. *See White*, 116 F.3d at 931-32.

a distinct substantive offense that requires proof of its own particular elements."); *cf*. *United States v. Marino*, 277 F.3d 11, 39 (1st Cir. 2002) (VICAR not lesser included offense of RICO count naming VICAR as predicate offense). In so concluding, we reject Mahdi's contention that "the indictment incorporated the definitions of those D.C. offenses as an element of the VICAR offense." Reply Br. 5; *see Diaz*, 176 F.3d at 96 ("[T]he reference to violating state law in the VICAR count is only meant to indicate unlawful conduct that constitutes a predicate offense for a VICAR charge under § 1959(a)(6).").

### B. Uncharged Conduct

Next, Mahdi contends the district court erred in not requiring that the government notify Mahdi of "intrinsic" evidence of uncharged conduct and in admitting such evidence despite the undue prejudice its "cumulation" caused him. *See* Appellant's Br. 17-23. Mahdi points to only two instances where the government elicited evidence of uncharged acts: (1) the testimony of Sherrilyn Lee, one of Mahdi's sellers, that on one occasion Mahdi put a knife to her back (although he did not use force or break the skin but was "playing"), Trial Transcript, *United States v. Mahdi*, Crim. No. 01-396-1, at 13-14 (a.m. May 13, 2003) (hereinafter cited in format: 5/5am Tr. 13-14); and (2) the testimony of drug purchaser and co-conspirator James Hamilton that, during an argument over the keys to Hamilton's van, Mahdi "lunged at [him] with a knife and struck" him in the shoulder, "just br[eaking] the skin" but leaving no scar, 5/7pm Tr. 71-76; 5/8pm Tr. 62-70. We see no ground for reversal.

We first address the lack of notice claim. Noting that "Rule 404(b) . . . requires the government to give notice of its intent to use [propensity] evidence to 'reduce surprise and promote early resolution on the issue of admissibility,' " Mahdi contends that, by denying his request for a "bill of particulars," the district court deprived him of his "ability 'to [be] inform[ed of] . . . the charge against him in sufficient detail [to] prepare a

defense and to minimize surprise at trial.' " Appellant's Br. 18, 20 (quoting *United States v. Gordon*, 780 F.2d 1165, 1172 (5th Cir. 1986)).[7] The government was not required, however, to provide notice of the intrinsic evidence to which Mahdi refers.

Federal Rule of Evidence 404(b) authorizes admission of "[e]vidence of other crimes, wrongs, or acts" provided it is offered not "to prove the character of a person in order to show action in conformity therewith" but rather "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Rule 404(b) further requires "that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice . . . of the general nature of any such evidence it intends to introduce at trial." No such notice is required, however, for evidence of an "intrinsic act," that is, an act that is "part of the crime charged." *United States v. Bowie,* 232 F.3d 923, 927 (D.C. Cir. 2000) (noting one consequence of labeling evidence 'intrinsic' is "to relieve the prosecution of Rule 404(b)'s notice requirement" (citing Fed. R. Evid. 404(b) advisory committee's note to 1991 amendments)). And Mahdi has correctly labeled the two cited incidents as "intrinsic acts" because the testimony about them was offered "not as circumstantial evidence requiring an inference regarding the character of the accused" but "as direct evidence of a fact in issue," which " 'will, by definition, always satisfy Rule 404(b).' " *United States v. Alexander*, 331 F.3d 116, 125-26 & n.13 (D.C. Cir. 2003) (quoting *Bowie*, 232 F.3d at 927). The testimony was offered, and admitted, to show "how [Mahdi] ke[pt] the worker-bees in line," 5/5am Tr. 15 (Lee incident) and "the kind of

---

[7]Mahdi acknowledges the district court directed the government to inform it before eliciting evidence that "falls outside the scope of the conspiracy evidence, or it is the kind of act of violence that would be what [the court] define[d] as shootings, stabbings, and robberies, killings." 3/6am Tr. 32.

organizational control" he exercised, 5/7am Tr. 13 (Hamilton)—facts placed in issue by Mahdi's defense that there was no organized enterprise at all and that "to the extent that a narcotics conspiracy existed it was made up of equals," of which he was but one. Appellant's Br. 4. Accordingly, the court did not err in failing to require that the government provide notice of the cited testimony.[8]

---

[8]On appeal, Mahdi argues—for the first time—that the lack of notice of the two incidents (and of a shooting revealed during Mahdi's cross-examination of government witness Joseph Hooker) deprived Mahdi of his Sixth Amendment right to confront witnesses. Because the argument was not raised before the trial court, we review it for plain error. *See Olano*, 507 U.S. at 732. Given the established rule that the government need not provide notice of intrinsic evidence and the dearth of authority to support Mahdi's contrary position—from this court or the Supreme Court—the "asserted error falls far short of plain error." *Perry*, 479 F.3d at 894 n.8 (internal quotation omitted). In any event, because Mahdi has not demonstrated any unfair prejudice from Lee's and Hamilton's testimony, as we next conclude, the failure to provide notice of the testimony did not "affect[] [Mahdi's] substantial rights," the third plain error prerequisite. *See United States v. Smith*, 232 F.3d 236, 243 (D.C. Cir. 2000) (" 'substantial rights' inquiry of Federal Rule of Criminal Procedure 52(b) mirrors Rule 52(a)'s 'harmless error' inquiry, except that the burden in the former falls on the defendant to show prejudice" (quoting *Olano*, 507 U.S. at 734 (1993))); *United States v. Baugham*, 449 F.3d 167, 183 (D.C. Cir. 2006) (third *Olano* element requires that appellant " 'make a specific showing of prejudice,' i.e., show that the error 'affected the outcome of the district court proceedings' " (quoting *Olano*, 507 U.S. at 734-35)). With regard to the shooting testimony Mahdi's counsel elicited from Hooker on cross-examination, Mahdi offers no authority that a defendant's Sixth Amendment right is violated when his own counsel elicits on cross-examination his bad acts. *Cf. United States v. Brazel*, 102 F.3d 1120, 1154 (11th Cir. 1997) ("[T]he fact that cross-examination is fraught with the peril of bringing out other facts detrimental to a defendant

Nor did the court abuse its discretion in declining to exclude Lee's and Hamilton's testimony under Rule 403 as unfairly prejudicial. *See United States v. Gartmon*, 146 F.3d 1015, 1020 (D.C. Cir. 1998) (abuse of discretion standard applicable to Rule 403 rulings). Mahdi contends the "cumulation of uncharged conduct, of which defense counsel had no notice and could not counter, was highly prejudicial." Appellant's Br. 20. The cited testimony, however, did not cause Mahdi undue prejudice, either individually or cumulatively. It involved two relatively minor incidents which paled alongside the extreme violence of the acts of which Mahdi was indicted and convicted: shooting nine people (resulting in the death of one) and stabbing and cudgeling two others.[9] The prejudice, if any, to Mahdi from evidence of the two acts (beyond the testimony's legitimate probative value) was therefore minimal.

## C. Right to Present a Complete Defense

Next, Mahdi claims he was prevented from mounting an effective defense by the government's evidentiary strategies and

---

does not amount to a denial of [his Sixth Amendment] right."). In the absence of such authority, we do not find the district court plainly erred. *See Perry*, 479 F.3d at 894 n.8. We note, in this regard, that the court repeatedly warned Mahdi's counsel that he (or she) should tread carefully on cross-examination given the many violent acts Mahdi had committed that might be unearthed, *see, e.g.*, 5/5am Tr. 11-12, 28, and, in particular, that Hooker knew of "serious acts of violence" that were "directly related" to Mahdi—to which defense counsel responded he "understood" what the court meant and would "stay away from that," 5/5pm Tr. 132-34. Nonetheless, Mahdi's counsel asked Hooker on cross-examination whether Hooker or Mahdi had shot Hooker's brother, Derrick, and Hooker responded it was Mahdi. 5/27pm Tr. 126-27.

[9]Indeed, as Mahdi's counsel acknowledged, "the indictment itself is . . . overwhelming with acts of violence." 5/7am Tr. 13.

the trial court's evidentiary rulings. Notwithstanding Mahdi's characterization of his claims as constitutional, we have held that when a defendant claims exclusion of testimony "violate[s] his Fifth Amendment right to due process and Sixth Amendment right 'to have compulsory process for obtaining witnesses in his favor,' " the court reviews the exclusion "under the typical abuse of discretion standard for evidentiary rulings" and the "statutory harmless error review standard" (i.e., error is harmless unless it has "substantial and injurious effect or influence in determining the jury's verdict," *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))—except in the "rare" case "in which a district court's application of a rule of evidence is so erroneous and unfair as to constitute a constitutional violation." *United States v. Lathern*, 488 F.3d 1043, 1045-46 (D.C. Cir. 2007). None of Mahdi's asserted evidentiary errors presents that rare case.

**John Floyd**

First, Mahdi claims the government deterred John Floyd, Mahdi's family's lawyer, from testifying in Mahdi's defense by attempting to put on evidence suggesting Floyd acted as a sort of "consigliere" to the Mahdis, coaching conspirators to commit perjury in a 1999 criminal prosecution of Mahdi's brother and counseling Mahdi himself to prepare to flee in October 2000. According to Mahdi, "Floyd would have provided evidence of wrongdoing by police officers who testified against Mr. Mahdi, contradicted cooperating witnesses' testimony, and countered the claim that [a lawsuit Mahdi filed against the police] was a weapon to ward off prosecution." Appellant's Br. 26. Mahdi asserted that the government's actions "prevented [Floyd] from testifying . . . by raising the possibility that information provided by cooperators, which had not been disclosed to defense counsel, would be used to impeach him and might form the basis for criminal charges or disciplinary action by the Bar." *Id.* The record, however, reveals no attempt by Mahdi to put

Floyd on the stand. In short, he identifies no error by the court. Further, Floyd himself told Mahdi's counsel he was "not concerned about any Fifth Amendment claim," 6/30pm Tr. 93, belying Mahdi's suggestion that the government's conduct deterred Floyd from testifying.

**Osale Gates**

Second, Mahdi asserts the court erroneously excluded the testimony of Osale Gates that government witness Abdul-Rahim had murdered one Dwayne T. Pate. During cross-examination of Abdul-Rahim, who had testified about an attempt on his life by Mahdi and Joseph Hooker[10] during which Abdul-Rahim's companion, Curtis Hattley, was shot and killed, defense counsel asked if Abdul-Rahim had ever "handled a gun or saw a gun." The witness responded: "I saw a gun before." Defense counsel followed up: "In whose possession, Mr. Hattley's?" and Abdul-Rahim responded "Yes." 6/23am Tr. 94. Afterward, defense counsel sought to put Gates on the stand to testify that Abdul-Rahim had indeed handled a gun when he shot and killed Pate in order to contradict what defense counsel claimed was Abdul-Rahim's denial he had ever handled one. The district court excluded Gates's testimony, which ruling Mahdi now challenges.

After much discussion, the district court ultimately excluded Gates's testimony on the ground that, assuming Abdul-Rahim had in fact denied ever using a gun, such a denial "would not merit contradiction by extrinsic evidence," 7/15pm Tr. 14. The court explained it "would not permit [Mahdi] to bring in a murder to show that [Abdul-Rahim] shot a gun"—not a "murder not related to any of the murders," 7/15am Tr. 123-

---

[10]Hooker was Mahdi's "shadow," seen constantly in his company. 6/24am Tr. 76-77. Hooker also purchased crack from Mahdi which he then resold on the street. 5/14am Tr. 54-56, 61, 65-66.

24. Mahdi's counsel indicated he "agree[d]," suggesting that otherwise they "would be [t]here for nine months on contradictions," *id.* at 124, and does not now challenge this aspect of the court's ruling. Mahdi again asserts, however, as he did below, that the court should have admitted the extrinsic testimony to show Abdul-Rahim's testimony was biased in the government's favor. 7/15pm Tr. 15.[11] *See United States v. Abel*, 469 U.S. 45, 50-52 (1984). The district court did not err in rejecting this argument.

Mahdi contends Abdul-Rahim was biased because he wanted to curry favor with the prosecutors to ward off an investigation into his involvement in Pate's murder. The court reasonably rejected the argument because there was no "connection between [Abdul-Rahim's] alleged shooting and the government" nor any "reason to infer that the government knew anything about th[e] event or was aware of it at any point in time prior to defense bringing it up here." 7/15pm Tr. 15. Accordingly, the court did not abuse its discretion in concluding

---

[11]At times the trial court and the parties made reference to Federal Rule of Evidence 608 as prohibiting impeachment by extrinsic evidence on a collateral matter. We recently recognized that Rule 608 " 'leave[s] the admissibility of extrinsic evidence offered for other grounds of impeachment[,] such as contradiction, . . . to rules 402 and 403.' " *United States v. Fonseca*, 435 F.3d 369, 375 (D.C. Cir. 2006) (quoting Fed. R. Evid. 608 advisory committee's notes to 2003 amendments). Thus, "such evidence is admissible provided that it is 'relevant' and not otherwise prescribed by law or rule." *Id.* (citing Fed. R. Evid. 402). "And evidence that would contradict [a witness's] trial testimony, even on a collateral subject" is relevant under Rule 401 "because it would undermine her credibility as a witness regarding facts of consequence." *Id.* The trial court made clear, however, that, whether or not Rule 608 applied, it did not view Abdul-Rahim's denying he ever used a gun as "merit[ting]" impeachment by extrinsic evidence of a murder—and an unrelated one at that. *See* 7/15pm Tr. 14; 7/15am Tr. 123-24.

that Gates's testimony was not admissible to establish bias. *Cf. United States v. Atherton*, 936 F.2d 728, 733-34 (2d Cir. 1991) (no abuse of discretion in excluding "bias" testimony about government informant's illegal drug use because "probative value of such evidence . . . depends in large measure on some showing that the government was contemplating prosecution, or at least was aware, of the illegality" and defendant "failed to connect [informant's] alleged drug use to the relationship between [informant] and the government" as "there was no showing of any government awareness of that use or any danger to [informant] that he would be prosecuted because of it"); *United States v. Lamp*, 779 F.2d 1088, 1095-96 (5th Cir.) (upholding exclusion of extrinsic "bias" testimony regarding government witness's unlawful possession of handgun where bias was based on "far-fetched" theory witness wanted to curry favor with prosecutor to avoid prosecution when there was no indication he believed he was being investigated or law enforcement was aware of possession before it was raised at trial), *cert. denied*, 476 U.S. 1144 (1986).

**Paul Tyler and Omar Washington**

Third, Mahdi claims the court erred in excluding the testimony of Paul Tyler and Omar Washington, which Mahdi sought to use to attack the credibility of Joseph Hooker, who testified at length about Mahdi's drug activities and violent acts. In particular, Mahdi wished to use their testimony to contradict Hooker's assertion that, before he "started hanging out with the Mahdis" in 1998, he "did not sell drugs or . . . ever shoot anyone," 5/27am Tr. 84, and thereby to impeach Hooker's credibility. According to Mahdi's counsel, both Tyler and Washington could testify that they witnessed Hooker selling

drugs and carrying a gun between 1995 and 1997 when the three were in high school together.[12]

Tyler invoked his Fifth Amendment right against self-incrimination and the court appropriately excluded his testimony based thereon, noting his "exposure on more than one front," 7/14am Tr. 95—namely, that he faced two pending criminal prosecutions and a grand jury investigation for his participation in a drug conspiracy and he appeared in government videotapes, admitted into evidence, showing him purchasing crack and marijuana from Hamilton. The court further declined to require Tyler to testify but "limit the government's right of cross-examination in some fashion"—to accommodate both Mahdi's Sixth Amendment right and Tyler's Fifth Amendment right—because the testimony sought from Tyler was not exculpatory. 7/14am Tr. 95-96. The court's decision was not an abuse of discretion.

In *United States v. Edmond*, 52 F.3d 1080 (D.C. Cir. 1995), we held in similar circumstances that in order to warrant requiring a witness to testify notwithstanding invocation of his Fifth Amendment right, the testimony sought must have the potential to be " '*exculpatory* testimony *exonerating* some of the alleged participants' " and not be testimony such as the defendant sought that simply "provided limited contradiction of testimony" by a government witness. 52 F.3d at 1110

---

[12]Mahdi's counsel proffered that Tyler would testify that he observed Hooker "with drugs on him"—cocaine which Tyler "believed . . . to be crack cocaine"—"in small ziplock bags" and "with guns, including in school." 7/14am Tr. 68-69. Mahdi's counsel was unable to proffer in any detail what testimony Washington would give as neither she nor her investigators had personally spoken with Washington. She was informed by Washington's brother, however, that Washington could testify to Hooker selling drugs and possessing guns while in high school.

(emphasis in original). Here, as in *Edmond*, the testimony sought is merely contradictory, undercutting Hooker's claim he was law-abiding before meeting Mahdi; it did not have the potential to exonerate Mahdi as is required under *Edmond*.

As for Washington, at the time of the trial he was an inmate at the Federal Correctional Institution in Estill, S.C. On July 10, 2003, Mahdi's counsel, suspecting Tyler might not be available to testify, sought a writ to transport Washington to testify at the trial. The court was advised by the U.S. Marshals Service that it would take 30 days to procure his presence and the court denied Mahdi's motion to continue the trial until then. The court did not abuse its discretion in declining to continue the trial for a full month so near to the lengthy trial's close—on the chance Washington would provide non-exonerating testimony of so little probative value. *See supra* note 12; *United States v. Gantt*, 140 F.3d 249, 256 (D.C. Cir. 1998) (continuance ruling reviewed only to determine whether judge "clearly abused his discretion" in weighing various factors, including length of requested delay and whether denying continuance will "result in identifiable prejudice to defendant's case, and if so, whether this prejudice is of a material or substantial nature") (internal quotation omitted).

**Curtis Reed**

Fourth, Mahdi asserts the court erroneously "refused to delay the trial" to secure the attendance of Curtis Reed to testify. Appellant's Br. 35. Mahdi sought Reed's testimony to contradict Hooker's assertion that after one of the charged shootings, Mahdi told Hooker he had hidden the murder weapon in Reed's house. According to Mahdi's counsel, Reed would testify he had never seen Mahdi with a gun and would not allow anyone to bring a gun into his house and no one had ever done so. 7/15am Tr. 10-11. Because Reed was attending school in Tennessee, the court issued a subpoena which the Marshals Service attempted unsuccessfully to serve at the Tennessee

address Mahdi's counsel had provided. The Marshals Service so informed the court and the defense said nothing further on the matter. We cannot say the court abused its discretion when it failed *sua sponte* to order a continuance Mahdi's counsel did not request.

Finally, we note that the testimony of Gates, Tyler, Washington and Reed would at best have contradicted minor points made by two government witnesses. Given the overwhelming unimpeached evidence of Mahdi's guilt provided by numerous witnesses, wiretaps and videotapes, exclusion of these four witnesses' impeachment testimony was, if error at all, harmless under *Kotteakos*, 328 U.S. at 776.

### *D. VICAR Counts*

Next, Mahdi challenges the VICAR prosecution on three grounds. We find none of them persuasive.

First, Mahdi asserts that VICAR is facially unconstitutional as it violates the Commerce Clause. We have already rejected this argument in *United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006). As we explained there:

> [I]t is impossible to see how a statute regulating conduct within the District of Columbia could exceed congressional authority under the Commerce Clause. As in the U.S. Territories, Congress has plenary authority in the District of Columbia. *See* U.S. CONST. art. I, § 8, cl. 17; U.S. CONST. art. IV, § 3, cl. 2; *see also, e.g., Binns v. United States,* 194 U.S. 486, 491, 24 S.Ct. 816, 48 L.Ed. 1087 (1904). Within the District, Congress did not need to rely on its Commerce Clause authority. Even if there were some doubt about § 1959's constitutionality outside the District of Columbia, "we need not find the language of [§ 1959] constitutional in all its possible applications in order to uphold its facial

> constitutionality." *Griffin v. Breckenridge,* 403 U.S. 88, 104, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971).

*Carson,* 455 F.3d at 368 (footnote omitted). Our analysis in *Carson* remains both correct and controlling. *See Nat'l Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 682 (D.C. Cir. 2008) ("We are, of course, bound to follow circuit precedent absent contrary authority from an en banc court or the Supreme Court.") (internal quotations and alterations omitted).

Second, Mahdi contends VICAR is unconstitutional as applied because "[e]ven if some criminal acts, such as murder for hire, may substantially affect interstate commerce and could be prosecuted under VICAR, the violent crimes at issue here are unrelated to interstate commercial activity." Appellant's Br. 42 (citing *United States v. Garcia*, 68 F. Supp. 2d 802 (E.D. Mich. 1999)). As we just explained, however, under *Carson*, the Commerce Clause is simply irrelevant to the VICAR statute as applied in the District.

Third, Mahdi argues the VICAR prosecution in this case violates the Department of Justice VICAR prosecution manual which states:

> In deciding whether to approve a prosecution under Section 1959, the Organized Crime and Racketeering Section will analyze the prosecution memorandum and proposed indictment to determine whether there is a legitimate reason the offense cannot or should not be prosecuted by state or local authorities. For example, federal prosecution may be appropriate where local authorities do not have the resources to prosecute, where local authorities are reasonably believed to be corrupt, where local authorities have requested federal participation, or where the offense is closely related to a federal investigation or prosecution. A prosecution

will not be authorized over the objection of local authorities in the absence of a compelling reason.

*Violent Crimes in Aid of Racketeering–18 U.S.C. § 1959: A Manual for Federal Prosecutors* at 3-4 (Dec. 2006). The gist of Mahdi's argument is that because the U.S. Attorney prosecutes all crimes in the District, there is no distinction between federal and local authorities to justify prosecuting under VICAR rather than under other federal or D.C. statutes. The manual itself, however, specifically provides that its "policies and procedures" are "internal Department of Justice policies and guidance only" and "are not intended to, do not, and may not be relied upon to, create any right, substantive or procedural, enforceable at law by any party in any matter civil or criminal. Nor are any limitations [t]hereby placed on otherwise lawful litigative prerogatives of the Department of Justice." *Id* at i. Accordingly, Mahdi's argument is foreclosed. *See In re Grand Jury Subpoena* (*Judith Miller*), 438 F.3d 1141, 1152-53 (D.C. Cir. 2006) (upholding reservation in U.S. Attorney's Manual guidelines which "expressly state[s] that they do 'not create or recognize any legally enforceable right in any person' " (quoting 28 C.F.R. § 50.10(n)).

### *E. Sentence*

Finally, Mahdi contends that, if his convictions are affirmed, his sentence should be remanded for two reasons: (1) many of the D.C. counts merge with the corresponding federal counts; and (2) under *United States v. Booker*, 543 U.S. 220 (2005), the district court erroneously made factual findings exclusively within the jury's province and applied the U.S. Sentencing Guidelines as mandatory. We address his two grounds in reverse order.

First, as to his *Booker* argument, the government concedes that there is "no indication that the court"—sentencing pre-*Booker*—"treated the Guidelines as anything but mandatory."

Appellee's Br. 74. Nonetheless, "[b]ecause [Mahdi] did not preserve [his] challenge to this error before the trial court, we review the district court's decision under the plain error standard set forth in [*United States v.* ]*Coles*," 403 F.3d 764 (D.C. Cir. 2005). *Carson*, 455 F.3d at 383. "Applying this standard, we must determine whether the district court's error affected the defendant's 'substantial rights in a material way,' " that is, " 'whether there would have been a materially different result, more favorable to the defendant, had the sentence been imposed in accordance with the post-*Booker* sentencing regime.' " *Id*. (quoting *Coles*, 403 F.3d at 767) (footnote omitted). The answer is no and this case is counted among those in which we can " 'be confident that [the] defendant has suffered no prejudice' " and therefore "affirm the sentence." *Id*. (quoting *Coles*, 403 F.3d at 769).

As in *Carson*, "[n]o remand is needed . . . because [VICAR], 18 U.S.C. § 1959(a)(1), and not the Guidelines, mandates that [Mahdi] receive[] a life sentence for [his VICAR] conviction[]," *id*. at 384—in this case, VICAR requires a minimum sentence of life for the murder of Curtis Hattley (Count 12). *See* 18 U.S.C. § 1959(a)(1) (defendant "shall be punished—(1) for murder, by death or life imprisonment, or a fine under this title, or both.").[13] In addition, the consecutive 7- and 25-year sentences imposed for Counts 27-32 are mandatory under 18 U.S.C. § 924(c). Accordingly a remand would not benefit Mahdi.

---

[13]In *Carson*, we, "like the Second Circuit, reach[ed] the common sense conclusion that the VICAR statute does not permit a fine to be levied in lieu of imprisonment or death." 455 F.3d at 385 n.44 (citing *United States v. James*, 239 F.3d 120, 127 (2d Cir. 2000)). We note that, even without the VICAR murder conviction, Mahdi would face a mandatory statutory minimum sentence of 132 years for his six firearms convictions under 18 U.S.C. § 924(c)(1)(A)(ii), (C)(i).

Second, we need not decide Mahdi's merger argument here because even if there is a merger, his D.C. convictions will merge into the federal counts and his federal mandatory statutory sentences will not change. *See United States v. Dale*, 991 F.2d 819, 859 (D.C. Cir. 1993) (per curiam); *United States v. Boyd*, 131 F.3d 951, 954-55 (11th Cir. 1997) ("The proper remedy for convictions on both greater and lesser included offenses is to vacate the conviction and the sentence of the lesser included offense."). In any event, as we concluded *supra* Part II.A, Mahdi failed to establish that any of the counts of conviction is multiplicitous and he adds no new arguments here.

Finally, the government concedes that a limited resentencing remand is appropriate because six convictions for simple distribution of, or PWID, drugs (Counts 38-43) merge into the analogous convictions for distribution of, or PWID, drugs within 1,000 feet of a school (Counts 44-49).

For the foregoing reasons, Mahdi's convictions and sentences are affirmed except that we vacate Counts 38-43 and remand for limited resentencing to reflect the merger of Counts 38-43 into Counts 44-49. *See United States v. Whren*, 111 F.3d 956, 959-60 (D.C. Cir. 1997) ("[U]nless the court of appeals expressly directs otherwise, the district court may consider only such new arguments or new facts as are made newly relevant by the court of appeals' decision—whether by the reasoning or by the result."), *cert. denied*, 522 U.S. 1119 (1998).

*So ordered*.